UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE NEW YORK TIMES COMPANY and
MATTHEW ROSENBERG,

                    Plaintiffs,

            v.

CENTRAL INTELLIGENCE AGENCY,

                    Defendant.

No. 17 Civ. 6354 (ALC)

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

JOON H. KIM
Acting United States Attorney for the
Southern District of New York
*Counsel for Defendant*
86 Chambers Street, Third Floor
New York, New York 10007
(212) 637-2768
stephen.cha-kim@usdoj.gov

*Of Counsel:*

STEPHEN CHA-KIM
Assistant United States Attorney

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ......................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.    Summary Judgment May Be Granted on the Basis of the CIA's Good-Faith
      Declaration ................................................................................................................3

II.   The CIA Properly Declined to Either Confirm or Deny the Existence of Records
      Responsive to the Request .........................................................................................4

      A.    The Government May Issue a Glomar Response and Justify It Through
            an Agency Declaration, Which Must Be Afforded Substantial Weight ................4

      B.    The CIA's Response Was Properly Justified By Exemption 1 .............................5

      C.    The CIA's Response Was Also Properly Tethered to Exemption 3 .....................10

III.  The Government Has Not Officially Acknowledged the Existence or
      Non-Existence of Responsive Records .......................................................................13

CONCLUSION ........................................................................................................................17

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE**

*A. Michael's Piano Inc. v. FTC*,
    18 F.3d 138 (2d Cir. 1994)......................................................................... 10

*ACLU v. DoD*,
    628 F.3d 612 (D.C. Cir. 2011) ......................................................... 6, 7, 14, 15

*ACLU v. DOJ*,
    681 F.3d 61 (2d Cir. 2012)......................................................................... 7, 8, 10

*ACLU v. U.S. Dep't of Justice*,
    229 F. Supp. 2d 259 (S.D.N.Y. 2017).................................................... 3

*Amnesty Int'l USA v. CIA*,
    728 F. Supp. 2d 479 (S.D.N.Y. 2010)........................................................ 7, 12

*Associated Press v. DOJ*,
    549 F.3d 62 (2d Cir. 2008)............................................................... 3

*Carney v. DOJ*,
    19 F.3d 807 (2d Cir. 1994)............................................................... 3

*Center for Constitutional Rights v. DoD*,
    968 F. Supp. 2d 623 (S.D.N.Y. 2013).............................................. 10

*CIA v. Sims*,
    471 U.S. 159 (1985)............................................................. 7, 10, 11, 12

*Earth Pledge Found. v. CIA*,
    988 F. Supp. 623 (S.D.N.Y. 1996), *aff'd*, 128 F.3d 788 (2d Cir. 1997) .......................... 12

*Fitzgibbon v. CIA*,
    911 F.2d 755 (D.C. Cir. 1990) ................................................... 7

*Florez v. CIA*,
    829 F.3d 178 (2d Cir. 2016)........................................................ 16

*Frugone v. CIA*,
    169 F.3d 772 (D.C. Cir. 1999) ................................................ 7, 16

*Gardels v. CIA*,
    689 F.2d 1100 (D.C. Cir. 1982)................................................. 11

*Halperin v. CIA*,
  629 F.2d 144 (D.C. Cir. 1980) ........................................................................ 7

*Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy*,
  891 F.2d 414 (2d Cir. 1989) ......................................................................... 13

*Hunt v. CIA*,
  981 F.2d 1116 (9th Cir. 1992) ................................................................... 4, 12

*Intellectual Property Watch v. United States Trade Rep.*,
  205 F. Supp. 2d 334 (S.D.N.Y. 2016) ......................................................... 15

*John Doe Agency v. John Doe Corp.*,
  493 U.S. 146 (1989) ........................................................................................ 2

*Judicial Watch v. DoD*,
  715 F.3d 937 (D.C. Cir. 2013) ........................................................................ 7

*Larson v. Dep't of State*,
  565 F.3d 857 (D.C. Cir. 2009) .............................................................. 7, 10, 11

*Miller v. Casey*,
  730 F.2d 773 (D.C. Cir. 1984) ...................................................................... 10

*Minier v. CIA*,
  88 F.3d 796 (9th Cir. 1996) .......................................................................... 4, 5

*Morley v. CIA*,
  508 F.3d 1108 (D.C. Cir. 2007) ..................................................................... 6, 7

*N.Y. Times Co. v. DOJ*,
  756 F.3d 100 (2d Cir. 2014), *opinion amended on denial of reh'g*,
  758 F.3d 436 (2d Cir. 2014), *supplemented*, 762 F.3d 233 (2d Cir. 2014) ............... 13, 15

*N.Y. Times Co. v. DOJ*,
  872 F. Supp. 2d 309 (S.D.N.Y. 2012) ............................................................ 3

*Phillippi v. CIA*,
  546 F.2d 1009 (D.C. Cir. 1976) ...................................................................... 4

*Pub. Citizen v. Dep't of State*,
  11 F.3d 198 (D.C. Cir. 1993) ....................................................................... 14

*Wilner v. NSA*,
  592 F.3d 60 (2d Cir. 2009) ................................................................... passim

*Wilson v. CIA*,
    586 F.3d 171 (2d Cir. 2009)............................................................. 13, 14, 15, 16

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007) .................................................................. passim

## STATUTES

5 U.S.C. § 552 ................................................................................................. 1

5 U.S.C. § 552(a) ............................................................................................ 2

5 U.S.C. § 552(a)(3)(A) .................................................................................. 8

5 U.S.C. § 552(b) ............................................................................................ 3

5 U.S.C. § 552(b)(1) ..................................................................................... 1, 6

5 U.S.C. § 552(b)(3) .................................................................................... 1, 10

50 U.S.C. § 3024(g)(1) ................................................................................. 11

50 U.S.C. § 3024(i)(1) .................................................................................. 11

50 U.S.C. § 3093(e) ...................................................................................... 9

## RULES AND REGULATIONS

Fed. R. Civ. P. 56(a) ....................................................................................... 3

73 Fed. Reg. 45,325 (July 30, 2008)............................................................. 11

75 Fed. Reg. 707 (Dec. 29, 2009) ................................................................... 6

## OTHER AUHTORITIES

H.R. Rep. No. 89-1497 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2418 ........................................ 2

## PRELIMINARY STATEMENT

Defendant the Central Intelligence Agency ("CIA" or the "Government"), by its attorney, Joon H. Kim, Acting United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, in this action brought under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), by plaintiffs The New York Times Company and Matthew Rosenberg (collectively, the "Times").

The FOIA request at issue in this litigation seeks records and documents related to a purported covert CIA program to arm and train Syrian rebels. The CIA issued a Glomar response to the request, stating that it could neither confirm nor deny the existence of responsive records. The CIA properly issued a Glomar response because confirming or denying the existence or nonexistence of materials responsive to theFOIA request would itself reveal classified information, which is protected from disclosure by FOIA's first exemption, 5 U.S.C. § 552(b)(1) ("Exemption 1"). Additionally, responding to the FOIA request would disclose information specifically carved out from disclosure under FOIA by the National Security Act of 1947, and is thus protected by FOIA's third exemption, 5 U.S.C. § 552(b)(3) ("Exemption 3"). Each of these exemptions independently justifies the CIA's Glomar response.

## BACKGROUND

On July 25, 2017, the Times submitted a FOIA request (the "Request") by online submission to the CIA, seeking "[a]ll records and documents, including Inspector General reports, related to the program to which President Trump referred in a July 24, 2017 post on Twitter[.]" Declaration of Antoinette B. Shriner, dated November 8, 2017 ("Shiner Decl.") ¶ 6; Complaint [Dkt. No. 1] ¶ 8. The referenced "tweet" was posted to President Trump's twitter account, @realdonaldtrump, and stated: "The Amazon Washington Post fabricated the facts on

my ending massive, dangerous, and wasteful payments to Syrian rebels fighting [Syrian

President Bashar al-]Assad." Shiner Decl. ¶ 6. The post does not contain a link to, or explicitly

name, any particular news article published by the Washington Post.

On July 19, 2017, however, the Washington Post had posted an article purporting to

describe a "covert" CIA program to "arm and train moderate Syrian rebels battling the

government of Bashar al-Assad." *See* Greg Jaffe & Adam Entous, *Trump Ends Covert CIA

Program to Arm Anti-Assad Rebels in Syria, A Move Sought By Moscow*, WASHINGTON

POST, July 19, 2017, http://wapo.st/2tHnJrv?tid=ss_ mail&utm _ term=.a89c94c8228f.  The

article claimed that President Trump had recently ended the program.  *Id.*

In a letter dated August 23, 2017, the CIA responded to the Request.  *See* Shiner Decl.

¶ 7. The CIA informed the Times that, "in accordance with section 3.6(a) of Executive Order

13526, the CIA can neither confirm nor deny the existence or nonexistence of records responsive

to this request," both because the existence or nonexistence of such records was a properly

classified fact and because it was information relating to intelligence sources and methods and

therefore exempt from disclosure by statute. *See id*. The Times filed the instant action on August

22, 2017, *see* Complaint, and the Government answered on September 26, 2017 [Dkt. No. 7].

The Government now moves for summary judgment.

## ARGUMENT

Congress's purpose in enacting FOIA was "to reach a workable balance between the right

of the public to know and the need of the Government to keep information in confidence." *John

Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. No. 89-1497 at 6

(1966), *reprinted in* 1966 U.S.C.C.A.N. 2418, 2423). To that end, FOIA requires federal

agencies to make records and other materials generally "available to the public." *See* 5 U.S.C.

§ 552(a). However, FOIA specifically exempts nine categories of information from that requirement in order to protect specified interests or activities—such as personal privacy, law enforcement, national security, and commercial interests in proprietary information—that could be compromised by public disclosure. *See id.* § 552(b). Ultimately, the goal is to "maintain[ ] a balance between the public's right to know and the government's legitimate interest in keeping certain information confidential." *Associated Press v. DOJ*, 549 F.3d 62, 64 (2d Cir. 2008) (citations and internal quotation marks omitted).

### I.      Summary Judgment May Be Granted on the Basis of the CIA's Good-Faith Declaration

Actions brought under FOIA are typically resolved by summary judgment. *See, e.g., Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994). Summary judgment is warranted if a movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Affidavits or declarations supplying facts . . . giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *Carney*, 19 F.3d at 812 (footnote omitted).[1] An agency's justification for invoking a FOIA exemption will be deemed sufficient if it is logical and plausible. *See, e.g.*, *Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir. 2009); *ACLU v. U.S. Dep't of Justice*, 229 F. Supp. 2d 259, 264 (S.D.N.Y. 2017). Moreover, an agency's declaration in support of its determinations is accorded a presumption of good faith. *Id.* at 69.

In support of its motion, the CIA has submitted the declaration of Antoinette Shiner, an Information Review Officer with original classification authority at a level sufficient to conduct classification reviews. Shiner Decl. ¶¶ 3, 11. Because this declaration describes in detail the

---

[1] Accordingly, in accordance with the practice in this District, the Government has not submitted a Local Rule 56.1 statement. *See N.Y. Times Co. v. DOJ*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012).

3

bases of the CIA's application of FOIA exemptions and its justification for asserting a Glomar response, it is sufficient to sustain the Government's burden to secure summary judgment in this action.

**II.     The CIA Properly Declined to Either Confirm or Deny the Existence of Records Responsive to the Request**

Summary judgment in favor of the CIA is appropriate because the agency's Glomar response was justified for two independent reasons: first, the fact of whether or not any of the requested records exist is classified; and second, whether any records exist is information exempt from disclosure by operation of statute. Finally, to the extent that the Times asserts that a Glomar response is precluded because the information at issue has been officially acknowledged, that argument is without merit.

**A.  The Government May Issue a Glomar Response and Justify It Through an Agency Declaration, Which Must Be Afforded Substantial Weight**

As a threshold matter, it is well-established that an agency responding to a FOIA request "may issue a 'Glomar Response,' that is, refuse to confirm or deny the existence of certain records, if [a] FOIA exemption would [ ] preclude the acknowledgment of such documents." *Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996) (citing *Hunt v. CIA*, 981 F.2d 1116, 1118 (9th Cir. 1992)). If even the fact of whether records on a given topic exist or do not exist is classified, an agency may refuse to confirm or deny the existence of such records, as a compelled response either in the affirmative or negative would compromise that classified information. *See, e.g.*, *Wilner*, 592 F.3d at 68, 71 (citing *Phillippi v. CIA*, 546 F.2d 1009, 1012 (D.C. Cir. 1976) (upholding CIA's "neither confirm nor deny" response in response to a request related to the vessel "Hughes Glomar Explorer")).

As the Second Circuit has explained,

> To properly employ the Glomar response to a FOIA request, an agency must tether its refusal to respond to one of the nine FOIA exemptions—in other words, a government agency may refuse to confirm or deny the existence of certain records if the FOIA exemption would itself preclude the acknowledgment of such documents.

*Id.* (internal quotation marks and alterations omitted). An agency that provides a Glomar response has the burden of showing that a particular FOIA exemption applies to the fact of the sought records' existence or nonexistence. *See id.* "The agency may meet its burden by submitting a detailed affidavit showing that the information logically falls within the claimed exemptions." *Id.* (quoting *Minier*, 88 F.3d at 800). Indeed, in a case involving a Glomar response, "there are no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal." *Wolf v. CIA*, 473 F.3d 370, 374 n.4 (D.C. Cir. 2007) (internal quotation marks omitted).

As is true of all FOIA cases, "[i]n evaluating an agency's Glomar response, a court must accord substantial weight to the agency's affidavits, provided that the justifications for nondisclosure are not controverted by contrary evidence in the record or by evidence of bad faith." *Wilner*, 592 F.3d at 68 (internal quotation marks, ellipsis, and italics omitted). The declaration submitted by the CIA in this action meets this highly deferential standard, as discussed below.

### B.  The CIA's Response Was Properly Justified By Exemption 1

To begin, the CIA's Glomar response was proper on the basis of FOIA Exemption 1. Exemption 1 reflects Congress's concern that the presumption of disclosure be appropriately counterbalanced when national security interests come into play. Specifically, Exemption 1 shields from disclosure any materials that: "(A) [are] specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign

5

policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).

Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009), lays out the current standard for classification of information in the interest of national defense or foreign policy. Section 1.1(a) of the Executive Order lists four requirements for the classification of national security information. Two of these requirements are procedural: (1) that an "original classification authority" classify the information; and (2) that the information be "owned by, produced by or for, or [] under the control of the United States Government." E.O. 13526, § 1.1(a)(1), (a)(2). The third requirement is that an original classification authority "determine[] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and be "able to identify or describe the damage." *Id.* § 1.1(a)(4). Finally, the information must fall within one or more of eight protected categories listed in Section 1.4, *see id.* § 1.1(a)(3), which include, as relevant here, "intelligence activities (including covert action) . . . or methods," and "foreign activities of the United States," *id.* § 1.4. E.O. 13526 specifically authorizes agencies to provide a Glomar response where appropriate: "An agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors." *Id.* § 3.6(a).

The Government's burden under Exemption 1 "is a light one." *ACLU v. DoD*, 628 F.3d 612, 624 (D.C. Cir. 2011); *accord Morley v. CIA*, 508 F.3d 1108, 1124 (D.C. Cir. 2007) ("[L]ittle proof or explanation is required beyond a plausible assertion that information is properly classified[.]"). Decades of precedent firmly establish that the judiciary owes "special deference" to the Executive's predictions of national security harm that may attend public

disclosure of classified records so long as such predictions appear logical or plausible, as is the case here. *Morley*, 508 F.3d at 1124. Deference is mandated because, as the courts have recognized, predictions of national security harm are inherently speculative, and only the agencies with expertise in the area are in a position to make such judgments. *See, e.g.*, *Wilner*, 592 F.3d at 76 (explaining that "it is bad law and bad policy to second-guess the predictive judgments made by the government's intelligence agencies" regarding whether disclosure of information "would pose a threat to national security") (quotation marks omitted); *ACLU v. DOJ*, 681 F.3d 61, 70-71 (2d Cir. 2012) (quoting *Wilner*, 592 F.3d at 76); *Judicial Watch v. DoD*, 715 F.3d 937, 943 (D.C. Cir. 2013) (agency statement of threatened national security harm "'will always be speculative to some extent'") (quoting *ACLU v. DoD*, 628 F.3d at 619); *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) ("[t]he judiciary is in an extremely poor position to second-guess the predictive judgments made by the government's intelligence agencies" regarding national-security questions) (quotation marks omitted); *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980) ("[T]he court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency."); *accord Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990); *see also CIA v. Sims*, 471 U.S. 159, 179 (1985) (intelligence officials must "be familiar with 'the whole picture' as judges are not," and their decisions "are worthy of great deference given the magnitude of the national security interests and potential risks at stake"); *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) ("courts have little expertise" in international or intelligence matters, and may not dismiss "facially reasonable concerns"); *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 508 (S.D.N.Y. 2010) (deferring to executive declarations predicting harm to national security from disclosure). Accordingly, "[i]n the

national security context, [the Court] 'must accord *substantial weight* to an agency's affidavit concerning the details of the classified status . . . .'" *ACLU v. DOJ*, 681 F.3d 61 (2d Cir. 2012) (quoting *Wolf*, 473 F.3d at 374).

The Government has clearly met its burden of demonstrating that its Glomar response is proper under Exemption 1. As an initial matter, it should be noted that the FOIA request at issue does not "reasonably describe[]" the records sought, as required under FOIA. 5 U.S.C. § 552(a)(3)(A). The Request seeks documents related to a "program" supposedly referenced in the President's twitter posting, yet the tweet itself makes no reference to any program. Rather, it is the Washington Post article that refers to a "covert CIA program." The tweet itself merely contests the accuracy of the Washington Post's reporting. The FOIA Request does not adequately identify what documents it is seeking, and is therefore facially deficient under FOIA.

But assuming, without conceding, that the Request reasonably described records related to an identifiable "program," *i.e.*, the purported covert CIA program to fund and train Syrian rebel groups described in the Washington Post article, the Government's Glomar response is proper under Exemption 1. The Shiner Declaration attests that the existence *vel non* of records related to such a program is "a currently and properly classified fact, the disclosure of which reasonably could be expected to cause damage to the national security." Shiner Decl. ¶ 16.[2] Shiner explains in detail how the requested information falls within the ambit of E.O. 13526, including how the procedural requirements of section 1.1(a) have been satisfied. *See id.* ¶¶ 11. Moreover, Shiner describes how the fact of the records' existence falls under two of the criteria laid out in section 1.4.

---

[2] The CIA's response, as described herein and in the agency's declaration, assumes for the sake of argument that the President's tweet in question did in fact allude to an identifiable, if conjectural, program. *See* Shiner Decl. ¶ 14. However, as discussed *infra*, it is far from clear that the tweet in fact acknowledged or referenced any actual program.

First, as the declaration details, acknowledging either the existence or nonexistence of the requested records could reasonably be expected to cause damage to national security by revealing the intelligence activities, sources, and methods of the United States. *Id*. ¶ 14. By its very terms, the FOIA request seeks information regarding covert intelligence activities purportedly engaged in by the CIA. Confirmation or denial of the kind of program alluded to by the Washington Post article, one evidently involving the CIA's involvement in clandestine activities in a foreign civil war aimed at advancing American national security interests, would implicate the kind of covert activity "to influence political, economic, or military conditions abroad" for which "it is intended that the role of the United States Government [should] not be apparent or acknowledged publicly." *Id*. ¶ 15 (quoting 50 U.S.C. §3093(e) (National Security Act)). Disclosing whether or not the purported program exists would allow hostile governments and other entities with interests in the current conflict in Syria to draw inferences about the CIA's methods of gathering intelligence in the field in similar situations, as well as its strategic capabilities and priorities. *See id*. ¶¶ 14-16. As explained by Shiner, the resulting harm is clear: an answer in either the affirmative or negative would reveal the allocation of agency priorities, capabilities, authorities, interests, and resources, as well as the exact nature of its relationship with foreign actors. *Id*. ¶ 16.

Thus, whether covert relationships between the CIA and rebel groups in Syria do or not exist, and whether the CIA has or has not covertly funded or provided training to certain Syrian rebels, are plainly the types of intelligence activities that the Government may rightfully decline to divulge. As the D.C. Circuit noted in upholding a Glomar response where a FOIA request sought documents related to attempts by United States to infiltrate Albanian guerilla groups, since a response to the request "would have amounted to an admission or denial that the

secret mission occurred, the CIA's claim of foreseeable harm to the national security is all but indisputable." *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984); *see also ACLU v. DOJ*, 681 F.3d at 70 (upholding claim of Exemption 1 where disclosure would reveal the existence of a classified intelligence activity); *Center for Constitutional Rights v. DoD*, 968 F. Supp. 2d 623, 638 (S.D.N.Y. 2013) (Glomar response appropriate where response by CIA would reveal whether CIA had intelligence interest in particular individual or his affiliates).

Second, Shiner describes how an affirmative or negative response to the Request would also compromise the foreign activities of the United States. Specifically, on the one hand, acknowledging the existence of documents related to a "program" as described by the Washington Post would reveal sensitive operations by the agency that by its nature must be kept covert. Shiner Decl. ¶ 15. On the other hand, a denial would tend to confirm the absence of specific operations and objectives in a sensitive foreign context, or the agency's lack of capacity for the same. *Id.* The interest in preserving the integrity of the CIA's interest in such foreign operations is a vital one. *See Wolf*, 473 F.3d at 376 (noting that confirmation or denial would thwart effectiveness of intelligence methods used overseas). In sum, given the "deferential posture in FOIA cases regarding the 'uniquely executive purview' of national security," *Larson*, 565 F.3d at 865, the CIA has offered sufficient bases to invoke a Glomar response tethered to Exemption 1 and E.O. 13526.

### C.  The CIA's Response Was Also Properly Tethered to Exemption 3

Separate and apart from Exemption 1, the CIA's Glomar response was independently justified under FOIA Exemption 3.[3] Exemption 3 protects records "specifically exempted from

---

[3] The Government "need only proffer one legitimate basis for invoking the Glomar response and FOIA Exemptions 1 and 3 are separate and independent grounds in support of a Glomar response." *Wilner*, 592 F.3d at 72 (citation omitted).

disclosure by statute." 5 U.S.C. § 552(b)(3). In weighing the validity of this exemption, a court must first consider whether the statute identified by the agency is in fact a withholding statute, and then whether the withheld material satisfies that statute's criteria. *See CIA v. Sims*, 471 U.S. 159, 167 (1985); *A. Michael's Piano Inc. v. FTC*, 18 F.3d 138, 143 (2d Cir. 1994). "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Wilner*, 592 F.3d at 72 (internal quotation marks omitted). As relevant to this action, section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024(i)(1) (formerly codified at 50 U.S.C. § 403-1(i)(1)) (the "NSA"), prohibits the unauthorized disclosure of intelligence sources and methods.[4]

As explained by Shiner, the CIA's response to the Request was appropriate on the basis of Exemption 3 and the NSA. First, there is no doubt that the NSA is an exemption statute encompassed by FOIA Exemption 3. *Sims*, 471 U.S. at 181; *see also Wolf*, 473 F.3d at 378. Moreover, unlike the requirements of Exemption 1, the Government is not required to make a showing of actual harm to national security from disclosure to justify nondisclosure under Exemption 3[5]: all an agency need do, as the CIA has done here, is show that the withheld

---

[4] The NSA provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1) (enacted as part of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 1011. Courts have recognized that not just the DNI, but also the CIA and other members of the intelligence community, may rely upon the amended NSA to withhold records under FOIA. *See, e.g.*, *Larson*, 565 F.3d at 862-63, 865. Section 1.6(d) of Executive Order 12333, as amended by Executive Order 13470, 73 Fed. Reg. 45,325 (July 30, 2008), requires the Director of the CIA to "[p]rotect intelligence and intelligence sources, methods, and activities from unauthorized disclosure in accordance with guidance from the [DNI.]"

[5] The requirement of showing harm to national security derives from the substantive requirement for classification pursuant to section 1.1(a)(1) of E.O. 13526.

information falls within the protected scope of the exempting statute. *See Larson*, 565 F.3d at 868.

Consequently, the only remaining issue is whether compelling the CIA to either confirm or deny the existence of responsive documents can "reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods." *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982). In this regard, the CIA has wide-ranging latitude to determine what could constitute or lead to an unauthorized disclosure of intelligence sources and methods. *See Sims*, 471 U.S. at 168-70. The Supreme Court has held that "[t]he plain meaning of the statutory language, as well as the legislative history of the National Security Act, . . . indicates that Congress vested in the Director of Central Intelligence very broad authority to protect all sources of intelligence information from disclosure." *Id.* at 168-69 (rejecting "any limiting definition that goes beyond the requirement that the information fall within the Agency's mandate to conduct foreign intelligence"). As the Court also observed, Congress "simply and pointedly protected all sources of intelligence that provide, or are engaged to provide, information the Agency needs to perform its statutory duties with respect to foreign intelligence." *Id.* at 169-70. Indeed, courts have characterized the CIA's discretion to withhold information under the NSA and Exemption 3 as "a near-blanket FOIA exemption." *Hunt*, 981 F.2d at 1120.

As already discussed, the Shiner Declaration details how a Glomar response is required in this case to protect intelligence activities and methods, including operations abroad. *See* Shiner Decl. ¶¶ 14-16. Courts routinely uphold such explanations as a valid basis to provide a Glomar response under Exemption 3 and the NSA and closely-related FOIA exempting statutes. *See, e.g.*, *Wilner*, 592 F.3d at 74; *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 503-4 (S.D.N.Y. 2010); *Earth Pledge Found. v. CIA*, 988 F. Supp. 623, 627-28 (S.D.N.Y. 1996), *aff'd*, 128 F.3d

788 (2d Cir. 1997). Accordingly, the CIA's response to the Request should be upheld on this separate and independent basis.

### III.   The Government Has Not Officially Acknowledged the Existence or Non-Existence of Responsive Records

Finally, the CIA's assertion of a Glomar response is proper because neither the CIA nor any other authorized official has officially and publicly acknowledged the existence or non-existence of the requested information. "An agency only loses its ability to provide a Glomar response when the existence or nonexistence of the particular records covered by the Glomar response has been officially and publicly disclosed." *Wilner*, 592 F.3d at 70. The Second Circuit applies a "strict test" to determine the applicability of this doctrine, specifying that the purportedly disclosed information must be: "(1) [ ]as specific as the information previously released, (2) match[ ] the information previously disclosed, and (3) [ ] made public through an official and documented disclosure." *Wilson v. C.I.A.*, 586 F.3d 171, 186 (2d Cir. 2009) (quoting *Wolf*, 473 F.3d at 378) (internal quotation marks and alterations omitted); *see Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy*, 891 F.2d 414, 421 (2d Cir. 1989) (Exemptions 1 and 3 "may not be invoked to prevent public disclosure where the government has *officially* disclosed the *specific* information being sought."); *see also N.Y. Times Co.* ("*New York Times*") *v. DOJ*, 756 F.3d 100, 120 & n.19 (2d Cir. 2014) (suggesting that the "matching" aspect of the *Wilson* test did not "require absolute identity" but nonetheless affirming and applying *Wilson*'s three-part test as good law in this circuit), *opinion amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014), *supplemented*, 762 F.3d 233 (2d Cir. 2014). These requirements are stringently applied, so that neither "widespread public discussion of a classified matter," nor "statements made by a person not authorized to speak for the Agency," nor "release of information by another agency,

or even by Congress" suffices to infer an official disclosure. *Wilson*, 586 F.3d at 186 (citations omitted).

Insofar as the tweet in question is alleged to be an official acknowledgment of the requested information, that suggestion is unfounded. Even assuming *arguendo*, without conceding, that the tweet was an official disclosure by the United States Government, an objective reading of the President's post demonstrates that it includes no definite acknowledgment of any covert program. *See* Shiner Decl. ¶ 13. The operative clause of the posting is: the "Washington Post fabricated the facts." *See id*. In other words, the tweet was remarking on the inaccuracy of the newspaper's reporting on the purported CIA program. A statement that a party was wrong about a purported fact *alleged* to be true can hardly equate to an admission of that alleged fact's veracity.

Moreover, the President's tweet does not specify in which respects the article is inaccurate: whether it is inaccurate as to the existence of the program described in the article, the nature of any such program, the CIA's involvement in any such program if it existed, or in any other respect. The ambiguity of the President's statement is an additional reason why it cannot serve as an official acknowledgement of any facts relating to the program described in the Washington Post article, let alone an acknowledgment that is as "specific" in nature as the information protected by the CIA's Glomar response. *ACLU v. DoD*, 628 F.3d at 621 (no official acknowledgment where there are substantive differences between the disclosed information and the information withheld).

As the Second Circuit has affirmed, "prior disclosures of information that do not 'match' the information in question [cannot] officially disclose properly classified information." *Wilson*, 586 F.3d at 187 (citing *Wolf*, 473 F.3d at 378). "The insistence on exactitude recognizes 'the

Government's vital interest in information relating to national security and foreign affairs.'"

*Wolf*, 473 F.3d at 378 (quoting *Pub. Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1993)).

For example, in *Wilson*, the Second Circuit considered whether the CIA had officially

acknowledged the employment status of Valerie Plame Wilson, a former covert CIA operative,

for the time period prior to 2002.  In connection with the prosecution of I. Lewis Libby, the CIA

had declassified and officially disclosed Wilson's employment status with the CIA as of January

1, 2002. 586 F.3d at 176. The Second Circuit concluded that this declassification could not serve

to officially disclose Wilson's pre-2002 employment status, however, as the requested

information did not "match" the information that had been acknowledged. *Id.* at 187. The Second

Circuit also held that the official disclosure of the Secrecy Agreement entered into by Wilson at

the start of her employment did not serve to officially disclose that she had been employed by the

CIA prior to 2002, even though that Agreement referenced an Executive Order that had been

revoked in 1995. *Id.* at 187 n.18. The Second Circuit noted that the "stray reference to an

executive order is neither 'as specific as' the information Ms. Wilson seeks to publish, nor does

it 'match' that information." *Id.* (quoting *Wolf*, 473 F.3d at 378).

The President's indirect allusion to a program mentioned in an article, made only in the

context of evaluating that reporting, did not in any way "match" information about the CIA's

involvement in a particular clandestine intelligence operation.  *See id.*; *see also ACLU v. DoD*,

628 F.3d at 621 ("matching" requirement for information sought and information allegedly

disclosed cannot be satisfied where there are "substantive differences" between the two);

*Intellectual Property Watch v. United States Trade Rep.*, 205 F. Supp. 2d 334, 358 (S.D.N.Y.

2016) (holding that the officially disclosed information regarding the final terms of a trade

agreement did not "match" plaintiff's request for information regarding the extent to which the

United States proposed the terms found in the final agreement); *see also New York Times*, 756 F.3d at 116 (discussing "substantial overlap" between two records at issue). The tweet itself therefore cannot be construed as an official acknowledgement of the information covered by the CIA's Glomar response.

Counsel for the Times has indicated to Government counsel that the Times intends to rely on statements made by General Raymond "Tony" Thomas, U.S. Special Operations Commander, at a forum on security issues held by the Aspen Institute on July 21, 2017, as a basis for official acknowledgment of a program to fund Syrian rebels. Yet the remarks by General Thomas, a Defense Department official, *see* https://www.defense.gov/About/Biographies/Biography-View/Article/709270/general-raymond-a-thomas-iii/, have no bearing on this case. As an initial matter, these remarks similarly do not refer to the CIA's involvement in any program to fund Syrian rebels. Thus, General Thomas's statement does not "match" information about CIA involvement in a particular clandestine intelligence operation.

Moreover, the Second Circuit has affirmed the principle that the official-acknowledgment "waiver is limited only to official and public disclosures made by the same agency providing the Glomar response, and therefore does not require the agency to break its silence as a result of statements made by another agency." *Florez v. CIA*, 829 F.3d 178, 186 (2d Cir. 2016) (quoting *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) (internal quotation marks and alterations omitted)); *see also Wilson*, 586 F.3d at 186 (noting that foreign governments may feel compelled to retaliate when officials disclosures are made by the CIA itself, which is why "the law will not infer official disclosure of information classified by the CIA" from "release of information by another agency"). Consequently, like President Trump's tweet itself, General Thomas' statements cannot form the basis of any claim of official disclosure.

**CONCLUSION**

For the reasons stated above, the Government's motion for summary judgment should be granted.

Dated: New York, New York
   November 8, 2017

        Respectfully submitted,

        JOON H. KIM
        Acting United States Attorney for the
        Southern District of New York

        *Attorney for Defendants*

By:  /s/ Stephen Cha-Kim
        STEPHEN CHA-KIM
        Assistant United States Attorney
        86 Chambers Street, Third Floor
        New York, New York  10007
        Telephone:  (212) 637-2768
        Facsimile:  (212) 637-2702
        E-mail: stephen.cha-kim@usdoj.gov