UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
THE NEW YORK TIMES COMPANY and :
MATTHEW ROSENBERG, :
 :
                      Plaintiffs, :
 :
      - against - :    17 Civ. 6354 (ALC)
 :
CENTRAL INTELLIGENCE AGENCY, :
 :
                      Defendant. :
---------------------------------------------------------------X

**REPLY MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFFS'
<u>CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

David E. McCraw, Esq.
The New York Times Company
Legal Department
620 Eighth Avenue
New York, NY 10018
phone: (212) 556-4031
fax: (212) 556-4634
mccraw@nytimes.com

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. i
TABLE OF AUTHORITIES ..........................................................................................................ii
PRELIMINARY STATEMENT .................................................................................................... 1
ARGUMENT .................................................................................................................................. 1
I.  THE CIA IGNORES REALITY AND THE LAW IN TRYING TO HIDE FROM THE PLAIN MEANING OF THE PRESIDENT'S TWEET ........................................................... 1
II. THE CIA HAS FAILED TO REBUT THE TIMES'S SHOWING THAT THE EXISTENCE OF THE SYRIA REBELS PROGRAM WAS DECLASSIFIED BY THE PRESIDENT'S TWEET AND INTERVIEW ........................................................................ 4
III. THE PRESIDENT'S TWEET CONSTITUTES "OFFICIAL ACKNOWLEDGEMENT" OF THE SYRIAN REBELS PROGRAM ............................................................................. 5
IV. THE CIA'S ASSERTION OF EXEMPTION 3 DOES NOT ADVANCE ITS CASE IN DEFENDING THE GLOMAR RESPONSE .......................................................................... 9
CONCLUSION ............................................................................................................................. 10

# **TABLE OF AUTHORITIES**

**CASES**

*ACLU v. CIA*, 710 F.3d 422 (D.C. Cir. 2013) ............................................................................. 7, 9

*Dep't of Navy v. Egan*, 484 U.S. 518 (1988) .............................................................................. 4, 10

*Florez v. CIA*, 829 F.3d 178 (2d Cir. 2016) ................................................................................ 4, 10

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195 (2d Cir. 2005) .............. 3

*Lee v. Bankers Trust Co.*, 166 F.3d 540 (2d Cir. 1999) ................................................................... 3

*Nat'l Day Laborer Org. Network v. Immigration & Customs Enforcement*, 827 F. Supp.2d 242 (S.D.N.Y. 2011) .......................................................................................................................... 5

*New York Times Company v. U. S. Department of Justice*, 756 F.3d 100 (2d Cir. 2014) ........ 6, 10

*Nunez v. A-T Fin. Info., Inc.*, 957 F. Supp. 438 (S.D.N.Y. 1997) ................................................... 3

*Restis v. Am. Coalition Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705 (S.D.N.Y. 2014) ............. 3

*Smith v. CIA*, 15 Civ. 1431, Dkt. No. 24 (D.D.C. Aug. 23, 2017) .................................................. 8

*Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009) ................................................................................... 6

**STATUTES**

5 U.S.C. § 552 ............................................................................................................................ 1, 10

50 U.S.C. § 3024(i) .................................................................................................................... 9, 10

**RULES AND REGULATIONS**

75 Fed. Reg. 707 (Dec. 29, 2009), Exec. Order 13526 .................................................................. 4

Plaintiffs The New York Times Company and Matthew Rosenberg (jointly, "The Times") respectfully submit this reply memorandum of law in support of their cross-motion for partial summary judgment on their Complaint brought under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

## PRELIMINARY STATEMENT

The Central Intelligence Agency ("CIA") raises a host of technical legal arguments to support its Glomar response. None of those arguments can change the facts: The President revealed a secret Government program to fund the Syrian rebels. It may be that all of the documents in the CIA's possession about that program are exempt from disclosure under FOIA. But that is not the issue for today. The sole issue in the current motion practice is whether the CIA can provide a Glomar response declining to say whether or not it has any documents about the program. The program's existence has been disclosed by the President. The CIA has no legal basis for a Glomar response.

## ARGUMENT

### I.

### THE CIA IGNORES REALITY AND THE LAW IN TRYING TO HIDE FROM THE PLAIN MEANING OF THE PRESIDENT'S TWEET

The CIA labors mightily to recast the President's tweet to say something other than what it says. In full, the tweet reads: "The Amazon Washington Post fabricated the facts on my ending massive, dangerous, and wasteful payments to Syrian rebels fighting Assad." (Declaration of David E. McCraw, dated Nov. 22, 2017 ("McCraw Decl."), Ex. 3, Donald Trump Tweet, July 24, 2017 ("July 24 Tweet").) Reasonably read, the tweet says the following:

1

- The U.S. Government had been making "massive, dangerous, and wasteful payments to Syrian rebels fighting Assad."

- The President had ended those payments.

- The President was referring to the payment program reported in the Washington Post (the "Post"), which described the program as a CIA initiative.

- The President believed that the Post had "fabricated facts on" his decision to end the program.

(*See* Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment ("Times Br.") 3-4, 12-14.)

As much as the CIA wants to accuse The Times of misreading the President's words, it is the CIA that struggles with the plain meaning of the tweet. (*See* Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Cross-Motion for Summary Judgment ("CIA Reply") 11.) The CIA may wish that the "President referred *broadly, repeatedly, and without qualification* to the falsity of the Washington Post article." (*Id.* (emphasis added).) How the CIA finds the words "fabricated the facts on" to qualify as a "broad" and "repeated" assertion of falsity "without qualification" is unclear. The President did not say, "the Amazon Washington Post story is wholly fabricated," no matter how much the CIA might prefer he had.

But what is more significant is the CIA's attempt to ignore the critical piece of the tweet: the president's reference to payments to the Syrian rebels that were "massive, dangerous, and wasteful." Those are terms that could apply only to something that exists in the real world. Whatever falsehoods the President may have seen in the Post's reporting *on how and why he made his decision* (*see* Times Br. 12-13), there is no question that he was referring to an actual

action that he had taken in the actual world: "massive, dangerous, and wasteful payments" that had been made.

The courts have steadfastly held to the idea that words should be given their plain meaning in areas ranging from contract law to statutory interpretation to libel. *See, e.g., LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (words and phrases should be given their plain meaning in a contract); *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms.") (internal citation omitted); *Nunez v. A-T Fin. Info., Inc.*, 957 F. Supp. 438, 441 (S.D.N.Y. 1997) (court must construe allegedly defamatory statement according to its plain meaning). And, yes, even tweets have been subject to the "plain meaning" rule. *Restis v. Am. Coalition Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 721 (S.D.N.Y. 2014) (in assessing libel action involving "letters, press releases, Facebook posts, and tweets drafted by communications professionals and former diplomats . . . . Defendants presumably meant what they said and intended their words to be understood in accordance with their plain meaning").

Were there any doubts about the President's meaning, they were dispelled in his interview with the Wall Street Journal. (*See* Times Br. 4, 14.) Rather than saying the Post story was fabricated, he instead acknowledged that it was based on a leak of information from the Government:

> Number one, they should go after the leakers in intelligence . . . I'm talking about intelligence leaks. I'm talking like the story about Syria that was in The New York Times the other day. I'm—which by the way, was a decision made by people, not me. But, you know, they wrote it 100—it was in the . . . It was in The Washington Post. That was not something that I was involved in, other than they did come and they suggested. It turns out it's—a lot of al-Qaeda we're giving these weapons to.

3

(McCraw Decl., Ex. 4, "Excerpts: Donald Trump's Interview with the Wall Street Journal," Wall Street Journal, July 25, 2017, at 5.)

As the Second Circuit said about the CIA's position in another Glomar case in which the courts were being asked by the agency to turn a blind eye to the obvious: "It defies reason to instruct a district court to deliberately bury its head in the sand . . . ." *Florez v. CIA*, 829 F.3d 178, 187 (2d Cir. 2016).

## II.

### THE CIA HAS FAILED TO REBUT THE TIMES'S SHOWING THAT THE EXISTENCE OF THE SYRIA REBELS PROGRAM WAS DECLASSIFIED BY THE PRESIDENT'S TWEET AND INTERVIEW

In its opening brief, The Times established that the President has the authority to declassify information. (Times Br. 9-10.) The CIA concedes that is so. (CIA Reply 2.) Because of the unpredictable imperatives of national security in a dangerous world, the President needs to have the immediate authority to do that when a situation requires immediate action. *See* Exec. Order 13526, Section 3.1(d) ("In some exceptional cases . . . the need to protect [classified] information may be outweighed by the public interest in disclosure of the information, and in these cases the information should be declassified."). Indeed, the Supreme Court has instructed that as "Commander in Chief of the Army and Navy of the United States," the president possesses constitutional authority to "classify and control access to information bearing on national security." *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988).

The CIA, unable to challenge that reality, instead provides a detailed discussion of how declassification works according to an Executive Order. (CIA Reply 2-3.) But it ignores that the Order clearly vests ultimate decisionmaking authority in the president. *See, e.g.*, Exec. Order

4

13526, Sec. 3.1(e) ("Any such [declassification] decision by the Director may be appealed to the President . . .")  And nowhere does the CIA contend that the President—unlike an intelligence agency—is required to follow this procedure.  How would such a rule be enforced against a president?  What would happen to a president who decided to not follow the procedure?  Could a president really be held to have violated his own executive order?  Those questions make the ultimate answer clear: The intelligence agencies do not have the authority to dictate how the President handles classified information.

If President Trump meant the tweet to be read in some way other than its plain meaning, there is only one person in a position to make that case: the President as the author of the tweet.  The CIA's declarant does not have first-hand knowledge of the President's thinking at the time he wrote and does not pretend to.  (*See* Declaration of Antoinette B. Shiner, dated Nov. 8, 2017, ¶ 13.)  Once a FOIA requester makes a *prima facie* case that an exemption asserted by an agency has been overcome, the burden shifts back to the agency to show why the exemption should still stand through a witness with knowledge.  *Nat'l Day Laborer Org. Network v. Immigration & Customs Enforcement*, 827 F. Supp.2d 242, 254 (S.D.N.Y. 2011) (discussing burden allocation in FOIA cases).  The CIA fails to make that case.

### III.

### THE PRESIDENT'S TWEET CONSTITUTES "OFFICIAL ACKNOWLEDGEMENT" OF THE SYRIAN REBELS PROGRAM

The CIA both misreads the law pertaining to official acknowledgement and misconstrues what The Times needs to show in its challenge to this Glomar response.

The CIA once again presses the idea that there must be a nearly identical match between what a government official discloses and the secret being held by the Government, relying on *Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009). (CIA Reply 4-5.) The Second Circuit has already rejected such a restrictive reading of *Wilson*. (*See* Times Br. 11-12.) In *New York Times Company v. U. S. Department of Justice*, the Second Circuit emphasized that it "do[es] not understand the 'matching' aspect of the *Wilson* test to require absolute identity," and that "[i]ndeed, such a requirement would make little sense" because "[a] FOIA requester would have little need for undisclosed information if it had to match information previously disclosed." 756 F.3d 100, 120 (2d Cir. 2014), *opinion amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014), *supplemented*, 762 F.3d 233 (2d Cir. 2014).

But irrespective of how broadly or narrowly *Wilson* is to be read, the disclosure by the President indisputably "matches" the sole secret underpinning the Glomar response. The CIA's Glomar is premised on a single fact: that the existence of the Syrian rebels program is a secret. If the program's existence is officially acknowledged, there is a match between the acknowledgement and the secret fact, and the Glomar response can no longer stand. That is precisely what has happened here.

The CIA focuses on the fact that while the tweet referred to the arming of Syrian rebels it did not identify the CIA as the agency running any such program. (*See* CIA Reply 8-11, 16-17.) Therefore, the CIA argues, even if the President was talking about an actual program, he did not disclose any role by the CIA role in it. It follows, the CIA says, that an acknowledgement by the CIA of the existence of documents would disclose a secret: the agency's involvement in the program. (*Id.* 8-9.)

There are two responses to that, both of which undermine the CIA's assertion of a Glomar response. The Post story identified the arms program as a CIA initiative. (McCraw Decl., Ex. 2, "Trump Ends Covert CIA Program to Arm Anti-Assad Rebels in Syria, a Move Sought by Moscow," Wash. Post, July 19, 2017.) The President officially acknowledged that he was talking about the CIA program by referencing the Post story. The fact that he did not name the CIA in the tweet is irrelevant.

Alternatively, even if the Court were to credit the CIA's theory that the tweet was referring generically to a Syrian rebels program and not acknowledging a covert CIA program, the result would be the same. The specific language of The Times's FOIA request is important: It asks for "[a]ll records and documents, including Inspector General reports, related to the program to which President Trump referred in a July 24, 2017 post on Twitter in which he stated: 'The Amazon Washington Post fabricated the facts on my ending massive, dangerous, and wasteful payments to Syrian rebels fighting Assad.'" (McCraw Decl., Ex. 6, July 25, 2017 FOIA Request.) The request does not mention the CIA at all. As a result, the CIA's mere acknowledgement that it possesses documents pertaining to a program supporting rebels in Syria would show only that the CIA had an interest in U.S. efforts to assist Syrian rebel fighters— which is not a secret. Such an acknowledgement would not reveal what the CIA claims is still a secret: whether the CIA itself was operating an arms program.

That very point was made in *ACLU v. CIA*, 710 F.3d 422 (D.C. Cir. 2013). There, a FOIA requester sought certain documents about U.S. Government drone strikes. The CIA responded with a Glomar, but the D.C. Circuit rejected it. "The CIA has proffered no reason to believe that disclosing whether it has any documents at all about drone strikes will reveal whether the Agency itself—as opposed to some other U.S. entity such as the Defense

7

Department—operates drones." *Id.* at 428.  While an acknowledgement of records would show an "intelligence interest" on the part of the CIA, it would not reveal whether the CIA was operating drones.  *Id.* at 428-29.  Because that interest was not secret, there was no basis for a Glomar.  *Id.* at 429-30.

A similar result was reached by the D.C. District Court in *Smith v. CIA*, 15 Civ. 1431, Dkt. No. 24 (D.D.C. Aug. 23, 2017).  There, a requester sought line items in the intelligence budget that related to the government's support for Israel. *Id.* at 1.  The court rejected the CIA's Glomar, even though President Obama had not referred to any specific intelligence agency when he publicly acknowledged that the United States provided intelligence assistance to Israel.  *Id.* at 4-5.  "Because the CIA is the *central* agency for intelligence, the court can reasonably assume that the CIA would have some involvement, or at least some intelligence interest, in the provision of intelligence assistance to a foreign nation," the Court reasoned, regardless of which agency actually proffered that assistance.  *Id.* at 5 (emphasis in original).

The same is true here.  It is no secret that the CIA is involved in the Syrian war and has an interest in the outcome of the conflict.[1]  At a minimum, the President's tweet confirmed the existence of a "massive" government program providing financial support to Syrian rebels.  (*See*

---

[1] CIA Director John Brennan repeatedly emphasized the CIA's intelligence interest and involvement in the Syrian war. *See, e.g.*, *Transcript: NPR's Interview With CIA Director John Brennan*, NPR (Feb. 24, 2016), http://n.pr/2FloJss ("[O]ver the past five years, the CIA has tried to fulfill its responsibilities in terms of getting a picture of what's going on inside the country, in various parts of Syria. We don't have an embassy there, but that doesn't mean that the CIA is not able to pursue its foreign intelligence collection responsibilities. We work in many, many different ways, and we are increasing our ability to gain insight and access to Syria."); *Transcript: NPR's Interview With CIA Director John Brennan*, NPR (Dec. 23, 2016), http://n.pr/2CWRJZS ("We are trying to make sure that the Syrian people can emerge from this experience with a political process that's going to give them the government they deserve, that's going to truly represent all the various groups inside Syria, while the same time trying to crush and destroy terrorists that are thriving right now and in many parts of the country."); *Transcript: Senate Intelligence Hearing on National Security Threats*, Wash. Post (Jan. 29, 2014), http://wapo.st/2qLp7xo ("And with the increasing diversity of the threats and with the growth, as you pointed out, of terrorist elements in places like Syria and Yemen, we have a number of fronts that we need to confront simultaneously.").

McCraw Decl., Ex. 2, July 24 Tweet.) It is both illogical and implausible to think that the CIA would not possess a single document about this program, regardless of where the program is housed or which agency officially exerted operational control. *See ACLU*, 710 F.3d at 430. It is, after all, as the *Smith* court said, the *central* intelligence agency.[2]

## IV.

### THE CIA'S ASSERTION OF EXEMPTION 3 DOES NOT ADVANCE ITS CASE IN DEFENDING THE GLOMAR RESPONSE

The CIA highlights Exemption 3 as a basis for its Glomar response. (CIA Reply 18.) The CIA is correct that Exemption 3 incorporates the secrecy provisions of the National Security Act of 1947, 50 U.S.C. § 3024(i) (the "Act"). (*Id.*) The CIA is also correct that the Act permits the Government to keep intelligence sources and methods secret without consideration of whether their disclosure would actually harm the national security. (*Id.*) Where the CIA errs is in thinking any of that matters at this stage of the litigation. Here, the question is whether the CIA's right to assert any exemption has been set aside—whether through the President's declassification of the program's existence, (Times Br. 9-10), his official acknowledgement of the program, (*id.* 11-14), or the doctrine of official disclosure from *Florez*, 829 F.3d at 185 n.6. (*Id.* 15-17).

The National Security Act prohibits the "unauthorized" disclosure of intelligence sources and methods. 50 U.S.C. § 3024(i). Under all three theories laid out by The Times, a Glomar

---

[2] The CIA has suggested that The Times's FOIA Request seeks records relating only to "the purported covert CIA program to fund and train Syria rebel groups described in the Washington Post article." (CIA Br. 8.) In fact, the FOIA Request is not so limited and seeks records pertaining to whatever arms program the President was referring to, no matter what agency was running it. (*See* McCraw Decl., Ex. 6, July 25, 2017 FOIA Request.) The CIA complains that it is "far from clear" whether the tweet "referenced any actual program," (CIA Br. 8 n. 2), but suggests that maybe the tweet was referring to a CIA program. (*Id.* at 8.) Documents about a CIA program would certainly fall within the scope of what the FOIA request is seeking but so would documents about other Syria arms programs run by other agencies.

9

tethered to Exemption 3 must fall.  If President Trump declassified the existence of the program, the disclosure cannot be considered "unauthorized."  *See Dep't of Navy*, 484 U.S. at 527.  If the tweet constituted official acknowledgment of the program, that official acknowledgment waives both Exemption 1 and Exemption 3 protection.  *See N.Y. Times*, 756 F.3d at 105, 124.  And if President Trump and General Thomas's public statements constituted official disclosure, then under *Florez—*as the CIA itself acknowledges, (CIA Reply 19 n.2)—that disclosure may become relevant to the court's consideration of whether an agency's Glomar response tethered to Exemption 3 is logical and plausible. 829 F.3d at 185 n.6 ("[T]here is no obvious reason why . . . third party disclosures cannot, in certain instances . . . permit an inference contradicting an asserting agency's Glomar response under Exemption 3.").

## CONCLUSION

For the foregoing reasons and those set forth in The Times's moving memorandum of law, Plaintiffs respectfully asks this Court (i) to order the CIA to make public within 20 days, pursuant to 5 U.S.C. § 552, the non-exempt portions of the requested records; (ii) to award the Plaintiffs the costs of this proceeding, including reasonable attorney's fees, as expressly permitted by FOIA, 5 U.S.C. § 552(a)(4)(E); and (iii) to grant such other and further relief as the Court deems just and proper.

Dated: New York, NY
       January 10, 2018
                                                    Respectfully submitted,

By: /s/ David E. McCraw

David E. McCraw, Esq.
The New York Times Company
Legal Department
620 Eighth Avenue, 18th Floor
New York, NY 10018
phone: (212) 556-4031
fax: (212) 556-4634
e-mail: mccraw@nytimes.com
*Attorney for Plaintiffs*

Of Counsel:

Christina Koningisor
(*Admission pending*)
The New York Times Company
Legal Department
620 Eighth Avenue, 18th Floor
New York, NY 10018