```
                                                USDC SDNY
                                                DOCUMENT ELECTRONICALLY
                                                FILED
UNITED STATES DISTRICT COURT                    DOC#: _____
SOUTHERN DISTRICT OF NEW YORK                   DATE FILED: 6-29-18
```

NEW YORK TIMES COMPANY,
MATTHEW ROSENBERG,

                              **Plaintiffs,**

-against-

CENTRAL INTELLIGENCE AGENCY,

                              **Defendant.**

**1:17-cv-06354 (ALC)**

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

      Plaintiffs, the New York Times Company and Matthew Rosenberg, bring this action challenging Defendant Central Intelligence Agency's *Glomar* response to Plaintiffs' request pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA") for any records related to an alleged covert CIA operation to arm and train Syrian rebels. The parties cross-move for summary judgment. For the reasons outlined below, Defendant's motion is **GRANTED**, and Plaintiffs' motion is **DENIED**.

## BACKGROUND

      On July 24, 2017, President Donald Trump, using his Twitter handle @realdonaldtrump, "tweeted": "The Amazon Washington Post fabricated the facts on my ending massive, dangerous, and wasteful payments to Syrian rebels fighting Assad." Decl. of David E. McCraw ("McGraw Decl."), Ex. 3, July 24, 2017 Tweet. Though the President's tweet does not reference any particular article published by the Post, the paper ran an article on July 19, 2017 reporting that "President Trump has decided to end the CIA's covert program to arm and train moderate Syrian rebels battling the government of Bashar al-Assad, a move long sought by Russia, according to U.S. officials." Greg Jaffe & Adam Entous, *Trump ends covert CIA program to*

*arm anti-Assad rebels in Syria, a move sought by Moscow*, Wash. Post, July 19, 2017, https://wapo.st/2IB0Pi2.

The following day, President Trump appeared to reference the Post article again during an interview with the Wall Street Journal. In response to a question regarding President Trump's disappointment with the Justice Department and Attorney General Jeff Sessions, President Trump responded:

> Number one, they should go after the leakers in intelligence. . . . I'm talking about intelligence leaks. I'm talking like the story about Syria that was in The New York Times the other day. I'm – which by the way, was a decision made by people, not me. But, you know, they wrote it 100 – it was in the – . . . It was in The Washington Post. That was not something that I was involved in, other than they did come and they suggested. It turns out it's – a lot of al-Qaeda we're giving these weapons to. You know, they didn't write the truthful story, which they never do. So all of those things are very important. But, no, I'm very disappointed in the fact that the Justice Department has not gone after the leakers. And they're the ones that have the great power to go after the leakers, you understand. So –and I'm very disappointed in Jeff Sessions.

McGraw Decl., Ex. 4, at 5, "Excerpts: Donald Trump's Interview with the Wall Street Journal," Wall St. J., July 25, 2017, ECF No. 14.

Prior to President Trump's tweet and statements, the alleged covert program was also referenced by General Raymond "Tony" Thomas, U.S. Special Operations Commander, during a talk at the 2017 Aspen Security Forum in response to a question from Catherine Herridge, Chief Intelligence Correspondent for the Fox News Channel:

> Ms. Herridge: It's now out in the public reporting that these anti-Assad rebels are very unhappy that this covert program to arm them has been rolled up. Is it your assessment that this was done to create favor with Russia, or that it was not an effective program?
>
> General Thomas: Absolutely—absolutely not in my—at least from what I know about that program and the decision to end it. Absolutely not a sop to the Russians. It was I think based on assessment of the nature of the program, what we're trying to accomplish, the viability of it going forward, and a tough, tough decision. I mean we're all reading the editorials now of are we leaving people at

> the altar, you know, people have we manned and equipped, but they're—it is so much more complex than even I can describe, and again that's not necessarily an organization that I've been affiliated with, but a sister—a parallel activity that was—that had a tough, you know, some would argue impossible mission based on the approach we took. It might have been scoped too narrowly or not empowered sufficiently. I don't know enough about it to criticize it in that direction, but it had a tough [row] to [hoe].

McCraw Decl., Ex. 5, Excerpts from General Tony Thomas's Statements at the 2017 Aspen Security Forum, July 21, 2017, ECF No. 12.

On July 25, 2017, the Times submitted a FOIA request to the CIA seeking "[a]ll records and documents, including Inspector General reports, related to the program to which President Trump referred in a July 24, 2017 post on Twitter in which he stated: 'The Amazon Washington Post fabricated the facts on my ending massive, dangerous, and wasteful payments to Syrian rebels fighting Assad.'" Compl. 2, ECF No. 1. On August 22, 2017, after 20 business days had elapsed without a response from the CIA, Plaintiffs filed the instant action requesting that the Court, *inter alia*, declare that the documents sought by the FOIA request are public and must be disclosed, and to order the CIA to provide said documents. *Id.* at 3. The following day, the CIA issued a "*Glomar* response"[1] to the Times's FOIA request, informing the Times that "in accordance with section 3.6(a) of Executive Order 13526, the CIA can neither confirm nor deny the existence or nonexistence of records responsive to this request" because the existence or nonexistence of such records was properly classified and because the information is related to intelligence sources and methods, which are exempt from disclosure by statute. Def.'s Mem. Supp. Mot. Summ. J. 2, ECF No. 10. Parties have now cross-moved for summary judgment.

---

[1] A *Glomar* response, which originates from a FOIA case concerning records related to the Hughes Glomar Explorer, is when "an agency . . . pursuant to FOIA's statutory exemptions, refuse[s] to confirm or deny the existence of certain records in response to a FOIA request . . . ." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 67 (2d Cir. 2009).

## STANDARD OF REVIEW

Actions brought under FOIA are typically resolved by summary judgment. *See Bloomberg L.P. v. Bd. of Governors of Fed. Reserve Sys.*, 649 F. Supp. 2d 262, 271 (S.D.N.Y. 2009), *aff'd sub nom. Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143 (2d Cir. 2010) (citing *Amnesty Int'l USA v. C.I.A.*, No. 07 CIV. 5435 (LAP), 2008 WL 2519908, at *8 (S.D.N.Y. June 19, 2008)). Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). There is no issue of material fact where the facts are irrelevant to the disposition of the matter. *Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 967 F. Supp. 2d 756, 761 (S.D.N.Y. 2013); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that a fact is material if it would "affect the outcome of the suit under governing law"). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Where parties file cross-motions for summary judgment, "'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *New York Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007) (citing *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir.2001)).

"To prevail on motion for summary judgment in a FOIA case, the defending agency has the burden of showing that [1] its search was adequate and [2] that any withheld documents fall within an exemption to the FOIA." *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (citing 5 U.S.C. § 552(a)(4)(B)) (citing *EPA v. Mink,* 410 U.S. 73 (1973)). Affidavits or declarations providing "reasonably detailed explanations why any withheld documents fall

4

within an exemption are sufficient to sustain the agency's burden" and are "accorded a presumption of good faith." *Id.* (citing *Safecard Servs., Inc. v. SEC,* 926 F.2d 1197, 1200 (D.C. Cir. 1991)). Furthermore, in the national security context, courts "'must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.'" *Am. Civil Liberties Union v. Dep't of Justice,* 681 F.3d 61, 69 (2d Cir. 2012) (citing *Wolf v. CIA,* 473 F.3d 370, 374 (D.C.Cir.2007)).

Agency affidavits, however, must describe with reasonable specificity the nature of the documents at issue and the justification for nondisclosure—conclusory assertions are insufficient. *Bloomberg,* 649 F. Supp. 2d at 271 (citing *Halpern v. F.B.I.,* 181 F.3d 279, 291 (2d Cir. 1999)). Where, as in here, an agency has invoked a *Glomar* response, the agency must "tether its refusal, to one of the nine FOIA exemptions," i.e., "a government agency may refuse to confirm or deny the existence of certain records if the FOIA exemption would itself preclude the acknowledgment of such documents." *Wilner v. Nat'l Sec. Agency,* 592 F.3d 60, 71 (2d Cir. 2009) (internal citation and quotations omitted). Moreover, "all doubts as to the applicability of an exemption must be resolved in favor of disclosure." *New York Times Co. v. U.S. Dep't of Justice,* 756 F.3d 100, 112 (2d Cir.), *opinion amended on denial of reh'g,* 758 F.3d 436 (2d Cir. 2014), *supplemented,* 762 F.3d 233 (2d Cir. 2014) (citing *Wilner,* 592 F.3d at 69).

In sum, the district court can award summary judgment on the basis of agency affidavits, *Carney,* 19 F.3d at 812 (citing *Goland v. CIA,* 607 F.2d 339, 352 (D.C.Cir.1978), *cert. denied,* 445 U.S. 927 (1980)), so long as the affidavits "[1] describe the justifications for nondisclosure with reasonably specific detail, [2] demonstrate that the information withheld logically falls within the claimed exemption, and [3] are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Wilner* 592 F.3d at 73. Conversely, "[s]ummary

5

judgment in favor of the FOIA plaintiff is appropriate when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption." *New York Times Co. v. United States Dep't of Justice*, No. 14CIV03776ATSN, 2016 WL 5946711, at *5 (S.D.N.Y. Aug. 18, 2016) (citing *Bloomberg*, 649 F. Supp. 2d at 271).

## ANALYSIS

Plaintiffs' cross-motion raises three threshold issues that must be resolved prior to determining whether the CIA's *Glomar* response pursuant to FOIA Exemptions 1 and 3 can stand. First, whether President Trump's tweet and public statements declassified the existence of a covert CIA program, and therefore overcome FOIA Exemptions 1 and 3. Second, whether the President's tweet and public statements were an official acknowledgement pursuant to *Wilson v. C.I.A.*, 586 F.3d 171, 186 (2d Cir. 2009), thereby waiving any applicable FOIA Exemptions. Third, whether General Thomas's public statements undermine the CIA's justification for its *Glomar* response. The Court resolves these questions in the negative, and holds that the CIA's *Glomar* response is appropriate under either FOIA Exemption 1 or 3. *See Wilner* 592 F.3d at 72 ("[D]efendants need only proffer one legitimate basis for invoking the *Glomar* response . . ."); *see also Larson v. Dep't of State*, 565 F.3d 857, 862–63 (D.C. Cir. 2009) ("FOIA Exemptions 1 and 3 are independent; agencies may invoke the exemptions independently and courts may uphold agency action under one exemption without considering the applicability of the other.").

### I. Plaintiff's Motion for Summary Judgment

#### a. *Presidential Declassification*

Plaintiff asserts that "legal effect of the President's public statements about the arms program was to declassify the existence of the program as well as its termination, and, in so

6

doing, take those facts outside of Exemptions 1 and 3." Pls.' Mem. Supp. Mot. Summ. J. 10, ECF No. 13. Given the facts here, however, Plaintiff's position is untenable.

It is undisputed that the President, as the head of the Executive Branch, has broad declassification authority. *See generally, Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (holding that the President is the "Commander in Chief of the Army and Navy of the United States" per Article II of the Constitution and her "authority to classify and control access to information bearing on national security . . . flows primarily from this constitutional investment of power . . . and exists quite apart from any explicit congressional grant.") (internal quotations omitted). Irrespective of the President's authority to declassify, the question of when her statements have the effect of declassifying classified information is an entirely separate issue. The Court is not aware of any case law on this particular question, which makes this an issue of first impression.

Presently, Executive Order 13526 ("EO 13526") governs the declassification of "Top Secret," "Secret," and "Confidential" information. 75 Fed. Reg. 707. Though EO 13526 provides the procedures for declassifying information, Plaintiffs argue there is no clear requirement that the President must follow the procedure outlined in the EO 13526 when declassifying information, and that a President may in fact not be bound by her own Executive Orders.[2] It does not follow, however, that the courts are in a position to decide whether a President's statements, absent an unequivocal declaration that she is declassifying information, have the effect of declassifying secret information. Doing so would fly in the face of *Egan*'s

---

[2] This line of reasoning seems to flow logically from the President's ability to rescind the Executive Orders of previous Presidents as well as her own, but the Court need not resolve this issue to reach a decision in this matter. *See generally, Hawaii v. Trump*, 859 F.3d 741, 757 (9th Cir.), *cert. granted sub nom. Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 198 L. Ed. 2d 643 (2017), and *vacated on other grounds and remanded*, 138 S. Ct. 377, 199 L. Ed. 2d 275 (2017) (President Trump rescinded his own Executive Order banning travel of nationals from certain countries and issued a new Executive Order to similar effect).

holding that the power to classify and declassify information bearing on national security rests with the Executive. 484 U.S. at 527. Put another way, permitting courts to infer whether a President declassified information would transfer the President's constitutional authority to declassify to the Judiciary, undermining the basic tenets of the separation of powers. *See, e.g., People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003) ("[U]nder the separation of powers created by the United States Constitution, the Executive Branch has control and responsibility over access to classified information . . . ."); *Stehney v. Perry*, 907 F. Supp. 806, 817 (D.N.J. 1995), *aff'd*, 101 F.3d 925 (3d Cir. 1996) ("For the judiciary to attempt to review the President's final say in matters of access to national security secrets would . . . violate 'fundamental principles of separation of powers.'") (citing *Dorfmont v. Brown*, 913 F.2d 1399, 1404 (9th Cir. 1990)) (Kozinsky, J., concurring).

Here, President Trump did not make an unequivocal statement, or any statement for that matter, indicating he was declassifying information. This should end the inquiry, but Plaintiffs argue that the plain meaning of President Trump's tweet and his statements to the Journal are sufficient to verify existence of a covert CIA program, and therefore President Trump's statements declassified the existence of the program. Yet, even when viewing the facts in a light most favorable to Plaintiffs, this argument is unsupported.

Based on the text of EO 13526, classification, and correspondingly declassification, is an official designation afforded to information by a classification authority. 75 Fed. Reg. 707 Part 1. Assuming President Trump's tweet is referring to the Post's article about a covert CIA program, his statement that the "facts on [his] ending massive, dangerous, and wasteful payments to Syrian rebels fighting Assad" were "fabricated" by the Journal is a far cry from an official statement on whether or not the existence or non-existence of the program remains classified.

Similarly, President Trump's comments to the Journal do not make any reference to classifying or declassifying information. In fact, his comments to the Journal were made in the context of his concern with intelligence leaks, which warrants the opposite inference than the inference drawn by the Times—that President Trump did not intend to declassify any intelligence.

Accordingly, the Court holds that (1) absent an unequivocal statement of declassification from the President or exceptional circumstances that are not present here, the Court will not infer whether the President's statements have the legal effect of declassifying information; and (2) President Trump's public statements in this case do not rise to the level of an unequivocal statement of declassification. At best, President Trump's statements could be treated as an official acknowledgement of an alleged covert CIA program, but Plaintiffs argument on this front also fails.

      b. *Official Acknowledgement*

Plaintiffs assert that even if President Trump's statements do not declassify the existence of the alleged covert CIA program, his statements officially acknowledge the existence of the program, thereby waiving the CIA's claims under FOIA Exemptions 1 and 3. President Trump's statements, however, do not meet the requirements under *Wilson* to be considered an official acknowledgement. 586 F.3d at 186.

In the *Glomar* context, "the specific information at issue is not the contents of a particular record, but rather the existence *vel non* of any records responsive to the FOIA request." *Am. Civil Liberties Union v. C.I.A.*, 710 F.3d 422, 427 (D.C. Cir. 2013) (internal quotations omitted). "As a general rule, an agency may invoke the *Glomar* doctrine in response to a FOIA request regarding a publicly revealed matter" so long as "the existence or nonexistence of the particular

records covered by the *Glomar* response has [not] been officially and publicly disclosed." *Wilner*, 592 F.3d at 70.

Under prevailing law, "[c]lassified information . . . is deemed to have been officially disclosed only if it (1) "[is] as specific as the information previously released," (2) "match[es] the information previously disclosed," and (3) was "made public through an official and documented disclosure." *Wilson*, 586 F.3d at 186.[3] In clarifying the "matching" requirement, the Second Circuit held that it does not "require absolute identity" because "such a requirement would make little sense. A FOIA requester would have little need for undisclosed information if it had to match precisely information previously disclosed." *New York Times Co.* 756 F.3d at 120. Accordingly, the question is whether or not President Trump's tweet and statements to the Journal revealed the existence of responsive records.

Determining if there has been an official acknowledgement of the existence of responsive records requires a fact-intensive inquiry. Both *Wolf* and *ACLU*, though not binding on this Court, are instructive. In *Wolf*, the plaintiff filed a FOIA request with the CIA for records about Colombian politician Jorge Eliecer Gaitan. 473 F.3d at 373. The CIA issued a *Glomar* response, but Plaintiff asserted that the CIA officially acknowledged the existence of the requested records when the then CIA Director testified before Congress referencing Gaitan and disturbances that followed his assassination. *Id.* at 379. The D.C. Circuit held that the CIA Director's statements officially acknowledged the records requested by Plaintiff because the Director "explicitly read some excerpts of [CIA] dispatches related to the disturbances that followed Gaitan's assassination" and these "excerpts included references to Gaitan, his followers and their

---

[3] Though the Second Circuit has expressed concern regarding the "questionable provenance" of the *Wilson* test and cautioned against its "rigid application," the *Wilson* test remains the law of this Circuit. *New York Times Co.* 756 F.3d at 120 n.19.

10

associates in connection with possible communist activity in Colombia." *Id.* (internal quotations and citations omitted).

On the other hand, in *ACLU*, the plaintiff requested from the CIA "documents about drones . . . none of which [were] limited to drones operated by the CIA." 710 F.3d at 428. The D.C. Circuit reasoned that it "strain[ed] credulity to suggest that an agency charged with gathering intelligence affecting national security" would not have records of drone strikes conducted by the U.S. government where (1) government officials, including the President, acknowledged the existence of the program, and (2) the CIA director discussed the program with specific detail. *Id.* at 429-31.

The facts in this case do not resemble *Wolf*. There is no suggestion that President Trump's tweet or statements to the Journal were sourced directly from the records requested by the Times. Though President Trump's statements need not exactly match the records requested per *New York Times Co.*, i.e., he does not need to read from the records to publically acknowledge them, there needs to be some evidence that his statements were based on the records requested for there to be an official acknowledgment under the *Wolf* line of reasoning. But, whether the facts resemble *ACLU* is a closer question.

In *ACLU*, the statements of public officials regarding drone strikes were unambiguous and specific. For example, President Obama stated that "a lot of these strikes have been … going after al Qaeda suspects," and then counterterrorism advisor John Brennan stated that "the United States Government conducts targeted strikes . . . sometimes using remotely piloted aircraft . . . ." 710 F.3d at 429. Here, President Trump's tweet does not unambiguously state that there is a program to arm and train Syrian rebels; rather President Trump's tweet broadly alleges that the Post "fabricated the facts" regarding his ending such a program. Furthermore, his tweet

does not specify which facts were fabricated, including whether a CIA program existed in the first place.

Plaintiffs ask the Court to infer from President Trump's description of the program as "massive, dangerous, and wasteful" that President Trump must be referring to a program that existed. Pls.' Mem. Supp. Mot. Summ. J. 13, ECF No. 13. But, these adjectives could just as easily be the President relaying what he believed to be the Post's "fabricated" characterization the program.[4] There is sufficient ambiguity here that the specificity and matching requirements under *Wilson* are not met. Even if a perfect match is not required, President Trump's tweet does not confirm the existence of the records being requested let alone the program.

Next, President Trump's statements to the Journal are similarly ambiguous and lack the requisite specificity to be considered an official acknowledgment. In his interview with the Journal, President Trump, while discussing his frustration with "intelligence leaks," referenced (1) an article in the Post about Syria; (2) that a decision was made by "people"; (3) that it was something he was not "involved in"; and (4) that the weapons, presumably referenced in the article, were actually being given to al-Qaeda. The CIA argues that reading President Trump's statements here to mean that "weapons intended for Syrian rebels had ended up in the hands of al-Qaeda," as the Times' asserts, requires the Court to impute to the President words that he did not say. Def.'s Reply Supp. Mot. Summ. J. 10, ECF No. 17.

The Court agrees that President Trump's statements did not confirm the existence of a program to arm Syrian rebels; he did not clarify what exactly a decision had to be made about or who made the alleged decision; and he did not clarify why there were weapons being given out,

---

[4] The Court notes that the Post's July 19, 2017 article does not use the adjectives used in President Trump's tweets. *See* Jaffe & Entous, *Trump ends covert CIA program to arm anti-Assad rebels in Syria, a move sought by Moscow*, Wash. Post, July 19, 2017, https://wapo.st/2IB0Pi2. The Court, however, is not in a position to assess why the President chose the words he did in his tweet allegedly describing the article.

to whom the weapons were given, or the manner in which they were given. *Cf. ACLU*, 710 F.3d at 429-431 (finding official acknowledgement where the CIA Director's statements made assurances regarding the "precision of targeted drone strikes, the level of collateral damage they cause, and their usefulness in comparison to other weapons and tactics."). As a result, his statements to the Journal do not constitute an official acknowledgement.

Even accounting the Times' contention that President Trump's statements officially acknowledge the existence of a covert program to arm and train Syrian rebels, Second Circuit law still permits the CIA to issue a *Glomar* response. In *Wilner*, the Second Circuit held that even if a program is officially disclosed in general, *Glomar* responses may be invoked "with respect to aspects of the program that have not been the subject of such disclosures." 592 F.3d at 70. In other words, a general acknowledgment of the existence of a program alone does not wholesale waive an agency's ability to invoke *Glomar* where certain aspects of the program remain undisclosed. In *Wilner*, plaintiffs sought records regarding any surveillance conducted under the widely officially acknowledged Terrorist Surveillance Program ("TSP"), but the court held that while the TSP was officially acknowledged, "the specific methods used, targets of surveillance, and information obtained through the program [had] not been disclosed," and therefore a *Glomar* response was permissible. *Id.* at 69-70.

The Plaintiffs' interpretation of the facts may generate a viable argument under the D.C. Circuit's reasoning in *ACLU*, as in that case even the general acknowledgment that the U.S. engaged in drone strikes by government officials was sufficient for the court to hold there was official acknowledgment that overcame the CIA's *Glomar* response. Under *Wilner*, however, Plaintiffs would need to point to more than President Trump's general statements regarding a program to arm and train Syrian rebels; there would need to be official acknowledgment that the

CIA operated said program for the Times's request for records from the CIA to be viable under Second Circuit law. As this was not the case here, i.e., the CIA's involvement if any was not officially disclosed, the Court holds that President Trump's statements do not overcome Defendant's *Glomar* response.[5]

### c. *"Public Disclosure"*

Plaintiffs' final basis for summary judgment is that "U.S. Special Operations Commander Tony Thomas independently confirmed the existence of the covert government program[,] . . . [which] undermines the plausibility of the CIA's *Glomar* response." Pls.' Mem. Supp. Summ. J. 15, ECF No. 13. Noting correctly that a *Glomar* response can only be waived by the agency that issued it, Plaintiffs rely on *Florez v. Cent. Intelligence Agency*, 829 F.3d 178 (2d Cir. 2016) to argue instead that "public disclosures of information by other agencies may render a *Glomar* response invalid." Pls.' Mem. Supp. Summ. J. 16, ECF No. 13. Plaintiffs' argument, however, is unavailing.

In *Florez,* the CIA issued a *Glomar* response in connection with a FOIA request for records related to the FOIA requestor's father, Dr. Armando J. Florez, who "served in several high-level diplomatic roles on behalf of the Republic of Cuba." 829 F.3d at 180. The district court granted summary judgment in favor of the CIA, upholding the CIA's *Glomar* responses pursuant to FOIA Exemptions 1 and 3. *Id*. at 181. Thereafter, the FOIA requestor filed an appeal during the pendency of which the FBI, pursuant to a separate FOIA request, "released

---

[5] *Wilner*'s carve out, that a *Glomar* response can be upheld even if a program has been generally acknowledged if the FOIA request relates to details of a program that have not been publically disclosed, appears to be in tension with the Second Circuit's holding in *New York Times Co.*, 756 F.3d at 120, that an absolute match between the requested information and the previous disclosure is not necessary, and corresponding dicta cautioning against the rigid application of the *Wilson* factors. 756 F.3d at 120 n.19. *New York Times Co.* does not clearly overrule *Wilner*, but the bounds of the official acknowledgment doctrine appear to be a live issue in this Circuit that may come to head in a case with facts that more closely resemble *Am. Civil Liberties Union v. C.I.A.*, 710 F.3d 422, 427 (D.C. Cir. 2013) than the case at bar.

several declassified documents pertaining to Dr. Florez." *Id.* In light of the release of these documents, which revealed, *inter alia*, that several government agencies "provided to or received from the FBI information concerning Dr. Florez," the Second Circuit held that the disclosures were "relevant evidence . . . bearing upon the sufficiency of the justifications set forth by the CIA in support of its *Glomar* response." *Id.* at 184; 187. As neither the court nor the FOIA requestor had access to the FBI documents prior to the appeal, the Second Circuit remanded the case for the district court to assess "whether its prior conclusion that the CIA adequately justified its *Glomar* response must be revised in light of the FBI disclosures." *Id.* at 189-90.

Here, General Thomas's statements, like President Trump's statements, lack sufficient specificity to have any bearing on the CIA's *Glomar* response. Per the holding in *Florez*, General Thomas's statements are relevant in assessing the credibility of the CIA's *Glomar* response, but his statements lack the detailed revelations that characterized the disclosures in *Florez*. For example, General Thomas's statements do not clarify which agencies were involved with the alleged covert program or how the program was operated. *Cf. Florez*, 829 F.3d at 184 (the FBI disclosures revealed that "(1) the FBI investigated Dr. Florez's background and tracked his career development, official activities, and international relocations; (2) the FBI cultivated informants in order to obtain information concerning Dr. Florez, including material which pertained to both his professional and personal conduct; and (3) several other government departments and agencies provided to or received from the FBI information concerning Dr. Florez . . . .") (internal citations omitted).

Furthermore, the General's statements are infirm ("[I]t is so much more complex than even I can describe;" "I don't know enough about it to criticize it . . . ."), suggesting a lack of familiarity with the alleged program, and do not confirm that his knowledge of the alleged

15

program stems from responsive records rather than "editorials" or other non-official sources. Accordingly, General Thomas's pontifications regarding the program at issue during a "Security Forum," while not irrelevant, lack the degree of detail that the Second Circuit concluded necessitated a re-evaluation of the CIA's *Glomar* response in *Florez* and thus, do not defeat the CIA's *Glomar* response in this case.

## II. Defendant's Motion for Summary Judgment

As noted previously, the CIA's *Glomar* response must be tethered to a FOIA exemption to be upheld—so long as the agency has proffered one legitimate basis for its *Glomar* response, summary judgment is warranted. *Wilner*, 592 F.3d at 71-72. Here, the CIA tethers its *Glomar* response to FOIA Exemption 1, the classified national security information exemption, 5 U.S.C. § 552(b)(1), and Exemption 3, the information protected by federal statute exemption. 5 U.S.C. § 552(b)(3). The Court holds that either provide an adequate basis for summary judgment in favor of Defendant.

### a. *Exemption 1*

FOIA Exemption 1 permits an agency to withhold records that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." U.S.C. § 552(b)(1)(A)-(B). "To withhold records under Exemption 1, the CIA must establish that it complied with proper procedures in classifying materials and that the withheld information falls within the substantive scope" of the relevant Executive Order. *Amnesty Int'l USA v. C.I.A.*, 728 F. Supp. 2d 479, 505–06 (S.D.N.Y. 2010) (citing *Salisbury v. United States*, 690 F.2d 966, 971–72 (D.C. Cir.1982)). As noted earlier, agency affidavits are entitled to "substantial weight" in the national security context and warrant summary judgment

16

so long as they justify nondisclosure with reasonably specific detail, demonstrate that information falls within the claimed exemption, and are not controverted by contrary evidence or bad faith. *Am. Civil Liberties Union*, 681 F.3d at 69 (citing *Wolf v. CIA*, 473 F.3d 370, 374 (D.C.Cir.2007)); *Wilner* 592 F.3d at 73.

In making its claim under Exemption 1, the CIA relies on EO 13526, 75 Fed. Reg. 707, *see* Def.'s Mem. Supp. Summ. J. 6, ECF No. 10, which lays out the four requirements for classification of information in the interest of national defense or foreign policy: (1) that an "original classification authority" must classify the information; (2) that the information must be "owned by or produced by or for, or is under the control of the United States Government;" (3) that "the information falls within one or more of eight protected categories listed in section 1.4," of EO 13526 which include "intelligence activities (including covert action) . . . or methods," and "foreign activities of the United States; " and (4) that the original classification authority "determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and be "able to identify or describe the damage." EO 13526 §§ 1.1(a)(1)-(4) to 1.4. EO 13526 also authorizes agencies to provide a *Glomar* response where appropriate: "An agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors." *Id.* at § 3.6(a).

The CIA submitted two declarations by Antoinette B. Shiner, an Information Review Officer for the CIA, in support of its claim under Exemption 1. *See* Declaration of Antoinette B. Shiner, ECF No. 11 ("Shiner Decl."); Supplemental Declaration of Antoinette B. Shiner, ECF No. 18 ("Shiner Supplemental Decl."). The Court holds that the Shiner's declarations thoroughly demonstrate the information requested falls within Exemption 1 with reasonably

specific detail. At the outset, Shiner, who has original classification authority and is authorized to conduct classification reviews, states that confirming the existence of responsive records related to a covert operation to arm Syrian rebels "would confirm the existence and the focus of a sensitive Agency activity that is by definition kept hidden to protect U.S. government policy objectives," while denying their existence would "confirm the absence of specific foreign policy objective . . . or the Agency's inability to successfully carry out the purported operational activities . . . ." Shiner Decl. ¶ 15. Therefore, Shiner concludes, "any substantive response would reveal sensitive information about the CIA's intelligence sources, methods, and activities that is protected from disclosure under Exemption 1." *Id.* at ¶ 16.

In response to Plaintiffs' criticism that Shiner's Declaration in support of Exemption 1 is conclusory and lacks specificity, Pls.' Mem. Supp. Summ. J. 18, Shiner's Supplemental Declaration explains that disclosing the existence or nonexistence of responsive records would (1) "reveal whether or not the United States Government exercised extraordinary legal authorities to covertly influence the political, economic, and/or military conditions in Syria[;]" (2) "compromise specific foreign policy goal[s] . . . or serve as confirmation for U.S. adversaries that there was no such objective[;]" and (3) assuming the CIA had a covert program, "would tend to reveal the Agency's capabilities, intelligence and regional interests, accesses, funding, and relationships or lack thereof," which adversaries "can exploit . . . to build a more accurate picture of the CIA's activities . . . impair[ing] the effectiveness of [the] CIA's intelligence operations." Shiner Supplemental Decl. ¶ 5. Given the relative high degree of deference an agency is entitled to in this context, the Court finds that the reasons articulated in the Shiner Declarations justify Defendant's *Glomar* response to Plaintiff pursuant to the FOIA Exemption 1. The same is true of Exemption 3.

b. *Exemption 3*

Exemption 3 permits agencies to withhold information that is "specifically exempted from disclosure by statute" if the statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." 5 U.S.C. § 552(b)(3); *Wilner*, 592 F.3d at 71. "Under that exemption, the CIA need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute." *Amnesty Int'l USA*, 728 F. Supp. 2d at 500–01 (S.D.N.Y. 2010) (citing *Larson*, 565 F.3d at 864 (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 761–62 (D.C. Cir.1990)). Additionally, "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage." *Id.* (citing *Goland* 607 F.2d at 350 (D.C. Cir.1978)).

Here, the CIA argues that its *Glomar* response was appropriate pursuant to the National Security Act of 1947, which prohibits the unauthorized disclosure of intelligence sources and methods. 50 U.S.C. § 3024(i)(1). The NSA is an exemption statute as contemplated by Exemption 3. *See C.I.A. v. Sims*, 471 U.S. 159 (1985); *Wolf*, 473 F.3d at 378. The only remaining hurdle is whether Defendant proved that confirming or denying the existence of responsive documents would "'reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods.'" *Gardels v. C. I. A.*, 689 F.2d 1100, 1103 (D.C. Cir. 1982) (citing to *Halperin v. Cent. Intelligence Agency*, 629 F.2d 144, 147 (D.C. Cir. 1980)). As described above, the Shiner Declarations provide sufficient bases for concluding that revealing whether or not responsive records exist in connection with an alleged program to arm and train Syrian rebels would lead to an unauthorized disclosure of intelligence sources and methods.

19

Thus, the Court holds that the CIA's *Glomar* response was appropriate under FOIA Exemption 3. Plaintiffs do not contest the applicability of this exemption; they only assert that their arguments in favor of summary judgment delink Defendant's *Glomar* response from Exemption 3. But, as the Court has rejected all of Plaintiffs' arguments, and Defendant has met its burden under Exemption 3, no further analysis is necessary.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is **DENIED**; Defendant's motion for summary judgment is **GRANTED**.

**SO ORDERED.**

Dated: June 29, 2018
New York, New York

**ANDREW L. CARTER, JR.**
**United States District Judge**