# MANDATE

N.Y.S.D. Case #
17-cv-6354(ALC)

## UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 9th day of July, two thousand twenty.

Before:     Robert A. Katzmann,
            *Chief Judge*,
            John M. Walker, Jr.,
            Michael H. Park,
            *Circuit Judges*.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Aug 31 2020

_____

The New York Times Company, Matthew Rosenberg,

                Plaintiffs - Appellants,

v.

Central Intelligence Agency,

                Defendant - Appellee.

_____

**JUDGMENT**

Docket No. 18-2112

The appeal in the above captioned case from a judgment of the United States District Court for the Southern District of New York was argued on the district court's record and the parties' briefs.  Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is AFFIRMED.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

**MANDATE ISSUED ON 08/31/2020**

**18-2112**
*The New York Times, et al., v. Central Intelligence Agency*

## In the

## United States Court of Appeals

### For the Second Circuit

————

AUGUST TERM, 2019

ARGUED: SEPTEMBER 6, 2019
DECIDED: JULY 9, 2020

No. 18-2112-cv

THE NEW YORK TIMES, MATTHEW ROSENBERG,
*Plaintiffs-Appellants,*

*v.*

CENTRAL INTELLIGENCE AGENCY,
*Defendant-Appellee.*

————

Appeal from the United States District Court
for the Southern District of New York.

————

Before: KATZMANN, *Chief Judge,* and WALKER, and PARK, *Circuit Judges.*

————

New York Times and Matthew Rosenberg (collectively, the Times) brought this Freedom of Information Act (FOIA) action seeking acknowledgement from the Central Intelligence Agency

1  (CIA) that it was aware of the existence of records regarding a covert

2  program of arming and training rebel forces in Syria.  Claiming that

3  such a disclosure was not required under two FOIA exemptions, the

4  CIA responded to the request with a so-called *Glomar* response stating

5  that the Agency could neither confirm nor deny the existence or

6  nonexistence of such records.  The Times then filed a complaint

7  asserting that certain statements made by the President and another

8  individual precluded use of the *Glomar* response. The parties cross-

9  moved for summary judgment.  The District Court for the Southern

10  District of New York (Carter, *J.*) granted summary judgment for the

11  CIA, holding that the relevant statements did not strip the CIA of the

12  two claimed exemptions because the statements did not officially

13  acknowledge or inadvertently declassify the existence of such a

14  program. We AFFIRM.

15      CHIEF JUDGE KATZMANN dissents in a separate opinion.

16                          _____

17

18          DAVID E. MCCRAW, The New York Times
19          Company, Legal Department, New York, NY *for*
20          *Plaintiffs-Appellants*.

21          JEANNETTE A. VARGAS (Benjamin H. Torrance, *on*
22          *the brief*), *for* Geoffrey S. Berman, United States
23          Attorney for Southern District of New York, NY,
24          *for Defendant-Appellee.*

25

26

JOHN M. WALKER, JR., *Circuit Judge*:

New York Times and Matthew Rosenberg (collectively, the Times) brought this Freedom of Information Act (FOIA) action seeking acknowledgement from the Central Intelligence Agency (CIA) that it was aware of the existence of records regarding a covert program of arming and training rebel forces in Syria.  Claiming that such a disclosure was not required under two FOIA exemptions, the CIA responded to the Times' initial FOIA request with a so-called *Glomar* response that that the Agency could neither confirm nor deny the existence or nonexistence of such records.  The Times filed a complaint asserting that certain statements made by the President and another individual precluded use of the *Glomar* response. The parties cross-moved for summary judgment.  The district court (Carter, *J.*) granted summary judgment for the CIA, holding that the relevant statements did not strip the CIA of the claimed exemptions because the statements did not officially acknowledge or inadvertently declassify the existence of such a program.  We AFFIRM.

## BACKGROUND

Plaintiffs-Appellants, the New York Times and Matthew Rosenberg, a reporter for the New York Times (collectively, the Times), submitted a FOIA request on July 25, 2017, seeking to compel disclosure by the CIA of records pertaining to a covert program

1    arming and training rebel forces in Syria.   The FOIA request
2    specifically sought "[a]ll records and documents, including Inspector
3    General reports, related to the program to which President Trump
4    referred in a July 24, 2017 post on Twitter." The Twitter post stated,
5    "The Amazon Washington Post fabricated the facts on my ending
6    massive, dangerous, and wasteful payments to Syrian rebels fighting
7    Assad . . . ." While President Trump did not specify the article in
8    question, the Washington Post had published an article on July 19,
9    2017, titled, "Trump ends covert CIA program to arm anti-Assad
10   rebels in Syria, a move sought by Moscow." The article stated that
11   "President Trump ha[d] decided to end the CIA's covert program to
12   arm and train moderate Syrian rebels battling the government of
13   Bashar al-Assad[.]"Additionally, during an interview with the Wall
14   Street Journal on July 25, 2017, the day after the Twitter post, the
15   President mentioned the "story about Syria that was in the New York
16   Times the other day" (before acknowledging that the story was in the
17   Washington Post). He then stated that the program was "not
18   something that [he] was involved in" and that the decision was
19   "made by people, not me."

20        Separately, on July 21, 2017, United States Special Operations
21   Commander, General Raymond (Tony) Thomas, was asked about the
22   "roll[ing] up" of a "covert program to arm [anti-Assad rebels]" at a
23   national security conference at the Aspen Institute.   In response,

Thomas said that the decision to end the program was "based on assessment of the nature of the program, what we're trying to accomplish, the viability of it going forward, and [was] a tough, tough decision."

On August 22, 2017, the Times filed the complaint in this case, asking the district court to compel disclosure of any records responsive to its FOIA request. By letter dated August 23, 2017, the CIA issued its *Glomar* response,[1] informing the Times that it could neither confirm nor deny the existence or nonexistence of records responsive to the request, pursuant to FOIA Exemptions 1 and 3. To support its response, the CIA submitted two declarations by Antoinette B. Shiner, an Information Review Officer for the agency. Shiner asserted that confirming the existence of responsive records would, for instance, "confirm the existence and the focus of sensitive

---

[1] The *Glomar* doctrine originated in a FOIA case, in the D.C. Circuit, involving records pertaining to the Hughes Glomar Explorer, an oceanic research vessel. *See Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976). In *Phillippi*, the CIA claimed that the "existence or nonexistence of the requested records was *itself* a classified fact exempt from disclosure under … FOIA." *Id.* at 1012 (emphasis added). The CIA asserted that, "in the interest of national security, involvement by the U.S. government in the activities which are the subject matter of [plaintiff's] request can neither be confirmed nor denied." *Id.* In this Circuit, we have held that the "*Glomar* doctrine is applicable in cases where to answer the FOIA inquiry would cause harm cognizable under a[] FOIA exception – in other words, in cases in which the existence or nonexistence of a record is a fact exempt from disclosure under a FOIA exception." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 70 (2d Cir. 2009) (internal citation omitted).

Agency activity that is by definition kept hidden to protect U.S. government policy objectives," and that denying their existence would "confirm the absence of specific foreign policy objectives . . . or the Agency's inability to successfully carry out the purported operational activities . . . ."

Both parties filed for summary judgment and, on June 29, 2018, the district court granted the CIA's motion and denied the Times's motion.[2] The district court first determined that the Shiner Declarations provided "sufficient bases for concluding that revealing whether or not responsive records exist in connection with an alleged program to arm and train Syrian rebels would lead to an unauthorized disclosure of intelligence sources and methods."[3] The district court then held that: (1) the CIA's *Glomar* response was appropriately tethered to FOIA Exemptions 1 and 3; (2) President Trump's statements did not declassify the existence of the covert Syrian program;] (3) those same statements did not officially acknowledge the existence of the program and therefore did not waive the CIA's eligibility for FOIA Exemptions 1 and 3; and (4) U.S. Special Operations Commander Thomas's statements did not

---

[2] *N.Y. Times Co. v. Cent. Intelligence Agency*, 314 F. Supp. 3d 519 (S.D.N.Y. 2018).

[3] *Id*. at 534.

independently confirm the existence of the covert government program.

**DISCUSSION**

This case lies at the intersection of two important competing interests: the need for the public to know what its government is doing and the need to keep secret certain government activity the disclosure of which could compromise national security, including by revealing clandestine sources and methods used to acquire foreign intelligence and to conduct covert operations.  FOIA provides an avenue for government transparency by making documents available to the public.  FOIA contains nine exemptions, however, to balance a variety of governmental interests, including national security, against the public interest in transparency.  Exemptions 1 and 3, at issue here, exempt information that is classified to protect national security (Exemption 1) and information that is prohibited from disclosure by another federal law (Exemption 3).[4]  The right to claim these exemptions can be waived, however, by official statements that acknowledge the existence of records pertaining to the secret activity and that meet certain, specific requirements.

---

[4] *See* 5 U.S.C. §§ 552(b)(1), 552(b)(3).

1       To properly invoke a *Glomar* response, an agency must "tether

2  its refusal to one of the nine FOIA exemptions."[5]  The agency can do

3  this by submitting affidavits or declarations that provide sufficient

4  detail as to why an exemption is appropriate.[6]  We review an agency's

5  justification *de novo*,[7] but when the information requested concerns

6  national security, courts "must accord *substantial weight* to an agency's

7  affidavit concerning the details of the classified status of the disputed

8  record."[8]  "Ultimately, an agency's justification for invoking a FOIA

9  exemption is sufficient if it appears logical or plausible."[9]

10       "Affidavits or declarations . . . giving reasonably detailed

11  explanations why any withheld documents fall within an exemption

12  are sufficient to sustain the agency's burden" and "are accorded a

13  presumption of good faith."[10]  "Summary judgment is warranted . . .

14  when the affidavits describe the justifications for nondisclosure with

15  reasonably specific detail, demonstrate that the information withheld

---

[5] *Wilner*, 592 F.3d at 71 (internal citation omitted).

[6] *Id.* at 69.

[7] *Id.* at 72.

[8] *ACLU v. Dep't of Justice*, 681 F.3d 61, 69 (2d Cir. 2012) (citing *Wolf v. CIA*, 463 F.3d 370, 374 (D.C. Cir. 2007)).

[9] *Wilner*, 592 F.3d at 75 (citing *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009)).

[10] *Id*. at 69 (quoting *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994)).

1    logically falls within the claimed exemption, and are not controverted

2    by either contrary evidence in the record nor by evidence of agency

3    bad faith."[11]

4        **I.    FOIA Exemptions**

5        Here, the CIA based its *Glomar* response on FOIA Exemptions

6    1 and 3.

7                a.  *Exemption 1*

8        Exemption 1 permits the nondisclosure of classified records

9    that are: "(A) specifically authorized under criteria established by an

10   Executive order to be kept secret in the interest of national defense or

11   foreign policy and (B) are in fact properly classified pursuant to such

12   Executive order."[12]  The CIA contends that the records are classified

13   under the criteria set forth in Executive order 13,526.[13]  Shiner's

14   affidavit attested that, in accordance with the criteria set forth in

---

[11] *Id*. at 73 (quoting *Larson*, 565 F.3d at 862).

[12] 5 U.S.C. § 552(b)(1).

[13] Executive order 13,526 allows records to be kept secret when: "(1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the United States Government; (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage."  Classified National Security Information, Exec. Order. No. 13526, 75 Fed. Reg. 707 (Dec. 29, 2009).

1  Executive order 13,256: (1) she was an original classification authority;

2  (2) the information was possessed by the United States Government;

3  and (3) the information sought related to intelligence activities,

4  intelligence source or methods, foreign relations or activities,

5  including confidential sources. Shiner then detailed why "any

6  substantive response would reveal sensitive information about the

7  CIA's intelligence sources, methods, and activities that is protected

8  from disclosure under Exemption 1."

9        b.  *Exemption 3*

10       FOIA Exemption 3 applies to records "specifically exempted

11  from disclosure by statute," provided that the statute "requires that

12  the matters be withheld from the public in such a manner as to leave

13  no discretion on the issue."[14]  The CIA pointed to Section 102(A)(i)(1)

14  of the National Security Act of 1947, as amended by 50 U.S.C.

15  § 3024(i)(1) (the National Security Act), which mandates that the

16  Director of National Intelligence "shall protect intelligence sources

17  and methods from unauthorized disclosure."  Shiner attested that

18  Exemption 3 applied because a substantive "response would reveal

19  information that concerns intelligence sources and methods," which

20  the National Security Act expressly protects from disclosure.

---

[14] 5 U.S.C. § 552(b)(3).

1    Agent Shiner's affidavits, together with the appropriate

2    deference owed to the agency, carried the CIA's burden of showing

3    that the two exemptions apply.  They set forth "logical or plausible"

4    justifications for both Exemption 1 and 3.[15]

5    In sum, we find that both exemptions apply because any

6    substantive response could reveal, as Shiner attested, "whether or not

7    the United States exercised extraordinary legal authorities to covertly

8    influence the political, economic, and/or military conditions in Syria"

9    or "the CIA's connection to such a program, if one existed."  At a

10   minimum, a substantive response to whether the CIA had any

11   documents would reveal that the agency had an interest – or lack

12   thereof – that could expose agency priorities, strategies, and areas of

13   operational interest.

14   ## II.    *Official Acknowledgement Doctrine*

15   The Times argues that the CIA's *Glomar* response, which

16   refuses to confirm nor deny the existence of records related to the

17   covert program at issue, is inappropriate because the President's

18   statements, both in the tweet on July 24, 2017 and in the Wall Street

19   Journal interview the following day, officially acknowledged the

---

[15] *Wilner*, 592 F.3d at 72-73 (citing *Larson*, 565 F.3d at 862–63) (noting that agencies "need only proffer one legitimate basis for invoking the *Glomar* response and FOIA Exemptions 1 and 3 are separate and independent grounds in support of a *Glomar* response").

1    existence of the covert program and, therefore, the CIA waived its

2    right to assert a FOIA exemption.

3           "[W]hen an agency has officially acknowledged otherwise

4    exempt information through prior disclosure, the agency has waived

5    its right to claim an exemption with respect to that information."[16]

6    More than a decade ago, in *Wilson v. CIA*,[17] we applied a precise and

7    strict test for claims of official disclosure.  Classified information that

8    a party seeks to obtain or publish is deemed to have been officially

9    disclosed "only if it (1) '[is] as specific as the information previously

10   released,' (2) 'match[es] the information previously disclosed,' and (3)

11   was 'made public through an official and documented disclosure.'"[18]

12          We cautioned in *Wilson* that courts will "not infer official

13   disclosure of information classified by the CIA from (1) widespread

14   public discussion of a classified matter, (2) statements made by a

15   person not authorized to speak for the Agency, or (3) release of

16   information by another agency, or even by Congress."[19]   The

17   consequence of our holding in *Wilson* is that just because the existence

18   of classified activity may be inferred from publicly available

19   information or from official statements, government waiver will not

---

[16] *Am. Civil Liberties Union v. C.I.A.*, 710 F.3d 422, 426 (D.C. Cir. 2013)

[17] 586 F.3d 171 (2d Cir. 2009).

[18] *Id*. at 186 (quoting *Wolf*, 473 F.3d at 378).

[19] *Wilson*, 586 F.3d at 186-87 (internal citations omitted) (collecting cases).

1    be found unless all legal criteria have been met.  As relevant here, an

2    agency is precluded from issuing a *Glomar* response if the existence or

3    nonexistence of the *specific records* sought by the FOIA request has

4    been the subject of an official public acknowledgment.[20]

5        The Times contends that district court: (1) erred by finding that

6    President Trump's statements were too ambiguous to have officially

7    acknowledged the records at issue; and (2) misread *Wilner* as holding

8    that a *Glomar* response is appropriate whenever the CIA might have

9    an "interest" in the discussed covert program even if the program is

10    conducted by another agency.

11        As an initial matter, the district court did not misread *Wilner*.

12    In *Wilner*, the "record [was] clear" that the "general existence of the

13    [relevant covert program] ha[d] been officially acknowledged"

14    through express statements by President Bush and CIA Director

15    Michael Hayden, although those statements did not disclose "the

16    specific methods, targets, and information obtained."[21]  We held that,

17    even though the general existence of the program had been disclosed,

18    a *Glomar* response was still appropriate with respect to "those aspects

19    of the program that have not been subject to such disclosures."[22]

20    Additionally, we found that "an agency only loses its ability to

---

[20] *Wilner*, 592 F.3d at 70 (emphasis added).

[21] *Id*. at 69.

[22] *Id*. at 70.

1    provide a *Glomar* response when the existence or nonexistence of the

2    *particular records* covered by the *Glomar* response has been officially

3    and publicly disclosed."[23]  This aligns with the district court's reading

4    of *Wilner* that "a general acknowledgement of the existence of a

5    program alone does not wholesale waive an agency's ability to invoke

6    *Glomar* where certain aspects of the program remain undisclosed."[24]

7    Even assuming *arguendo* that President Trump's statements revealed

8    the general existence of the alleged covert program, a *Glomar* response

9    is still appropriate if none of the relevant statements officially

10    acknowledged the existence or nonexistence of specific records.[25]  As

11    we will explain, in light of the *Wilson* test, the relevant statements did

12    not officially acknowledge the existence of a covert program, much

13    less the existence of corresponding, specific records.

14    The Times maintains that *Wilner* "supplies no basis for the

15    CIA's *Glomar* response" because, by disclosing the records sought, the

16    CIA would only be revealing its "interest" in the allegedly disclosed

17    program. We disagree.  The Shiner affidavits contain sufficiently

18    detailed justifications for invoking Exemptions 1 and 3 that are

---

[23] *Id*. (emphasis added).

[24] *N.Y. Times Co.*, 314 F. Supp. 3d at 530.

[25] *See Wilner*, 592 at 70.

1    broader than just a potential interest in the program: they include

2    protecting classified information and sources and methods.[26]

3         We have repeatedly advised that official disclosure is a "strict

4    test," and here, we agree with the district court that the President's

5    statements do not satisfy the "specificity" or "matching"

6    requirements set forth in *Wilson*.[27]   *Wilson* starkly illustrated the

7    specificity requirement.   There, plaintiff Valerie Plame Wilson, a

8    former CIA agent, sued the CIA arguing that her pre-2002 service

9    with the CIA could not remain classified.[28]   Agent Wilson pointed to

10   a letter, written on CIA letterhead, that specified the actual dates of

11   her prior service.   An official from the Agency's personnel

12   department signed the letter, which Wilson claimed to be an official

13   acknowledgment.[29]   Aware that the CIA still demanded that her

---

[26] *See* Executive order 13,526 (allowing classified records to be kept secret when "the information falls within one or more of the categories of information listed in section 1.4 of this order," which includes records that "pertain[]" to "intelligence activities (including covert action), intelligence sources or methods"); *see also James Madison Project v. Dep't of Justice*, 302 F. Supp. 3d 12, 30 (D.D.C. 2018) ("Contrary to Plaintiffs' contention, *ACLU*'s narrow holding is not controlling here because the FBI in this case asserts a broader justification for issuing a *Glomar* response than merely concealing an 'interest' in the Synopsis.").

[27] *See, e.g., Wilson*, 586 F.3d at 186; *N.Y. Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 120 (2d Cir. 2014), *opinion amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014), *supplemented*, 762 F.3d 233 (2d Cir. 2014).

[28] *Wilson*, 586 F.3d at 173–74.

[29] *Id.* at 181, 195.

1    service dates remain secret, Wilson then authorized a member of

2    Congress to publish the CIA letter in the Congressional Record.[30]

3        In *Wilson*, we acknowledged that the letter was "reliable as

4    evidence of [plaintiff]'s prior CIA affiliation," but stated that it was

5    "hardly akin to the CIA director personally reading relevant

6    information into the *Congressional Record*, as took place in *Wolf v.*

7    *CIA*."[31]    Accordingly, we held that there had been no official

8    acknowledgement even though the letter specified Wilson's dates of

9    service.[32]    It was our view that anything less than the official

10   disclosure upheld in *Wolf* "necessarily preserves some increment of

11   doubt regarding the reliability of publicly available information," and

12   that the CIA's "refusal to permit the elimination of that remaining

13   doubt . . . protects valuable information."[33]    Ultimately, we

14   "decline[d] to discount the importance of such 'lingering doubts' to

15   maintaining the secrecy of CIA sources and methods."[34]  And we do

16   so again here, notwithstanding the public statements by the President

17   and General Thomas regarding governmental activities in Syria.

---

[30] *Id*. at 174.

[31] *Id*. at 195.

[32] We held that the CIA had not officially acknowledged the plaintiff's pre-2002 service even though the Agency letter expressly stated "Dates of Service: CIA from 11/9/1985 to 1/9/2006 – total 20 years, 7 days."  *Id*. at 181.

[33] *Id*. at 195.

[34] *Id*. (internal citation omitted).

1    Likewise here, even after the public statements by President

2    Trump and General Thomas, lingering doubts remain as to the

3    information sought.  The President never specified that there was any

4    program – let alone one led by the CIA – designed to arm and train

5    Syrian rebels.  While the matching aspect of the *Wilson* test does not

6    require "absolute identity,"[35] the Times is asking us to draw

7    inferences that the President acknowledged the existence of a covert

8    CIA program.  For instance, regarding the President's statement to

9    the Wall Street Journal that the program was "not something that [he]

10   was involved in" and that the decision was "made by people, not me,"

11   it remains unclear what "decision," made by unidentified "people,"

12   President Trump was not "involved in."  While the Times argues that,

13   at a minimum, it "plainly" must be a decision to end a covert CIA

14   program, these statements, even packaged together, do not remove

15   *all* doubt as to their meaning.[36]

16   We agree with the Times that one reasonable way to interpret

17   President Trump's tweet regarding "massive, dangerous, and

18   wasteful payments to Syrian rebels fighting Assad" is with respect to

19   payments tied to the alleged covert program, as referenced in the

---

[35] *N.Y. Times Co.*, 756 F.3d at 120.

[36] *See ACLU*, 710 F.3d at 428 (holding that official statements left "no doubt" that some agency operates drones and thus this program was officially acknowledged).

1   antecedent Washington Post article.  As the district court suggested,

2   however, these statements "could just as easily be the President

3   relaying what he believed to be the Post's 'fabricated'

4   characterizations."[37]  Indeed, the tweet and the President's interview

5   both focus on the Washington Post's allegedly inaccurate reporting.

6   The references to payments are incidental to this criticism, which

7   obscures what, if anything, the President actually "disclosed."  The

8   tweet and interview thus are not the straightforward disclosures

9   satisfying *Wilson* that the dissent depicts them to be.[38]

10      Further, neither the tweet nor the Wall Street Journal interview

11   mentions the CIA and, therefore, anything other than a *Glomar*

12   response would likely reveal or refute that the CIA had an intelligence

13   interest in the program, evidenced by a cache of records.[39]  The dissent

14   minimizes the fact that neither the tweet nor the interview explicitly

---

[37] *N.Y. Times Co.*, 314 F. Supp. 3d at 529.

[38] *See* Dissent at 2–5.

[39] The dissent argues that "while the majority speculates that a *Glomar* response may additionally be appropriate to disguise any 'intelligence interest' the CIA has in the program, the CIA never advances this as a justification for its response and we are thus foreclosed from justifying the CIA's nondisclosure on this basis."  Dissent at 1.  We disagree.  To the contrary, the Shiner affidavits invoke the CIA's "intelligence and regional interests," App'x 60, as a basis for its *Glomar* response.  Agent Shiner declared that a non-*Glomar* response "would reveal the presence or absence of Agency priorities, capabilities, authorities, *interests*, resources, and relationships with foreign entities."  App'x 22 (emphasis added).

1    references the CIA,[40] but the absence is significant because it means

2    that there are "lingering doubts" as to the CIA's interest in the alleged

3    program. An official response that acknowledged the existence – or

4    nonexistence – of responsive records would eliminate those doubts.[41]

5          The Times points to *New York Times Co. v. U.S. Dep't of Justice*,[42]

6    to support its contention that the information sought needs only

7    "substantial overlap" with that which is publicly disclosed. **[BB 18]**

8    This argument is unpersuasive.  First, the Times in this case takes the

9    phrase "substantial overlap" in the prior case out of context.  In that

10   earlier case, the Times sought an Office of Legal Counsel (OLC) and

11   Department of Defense (DOD) Memorandum containing information

12   regarding targeted killings.[43]  We held that the CIA had officially

13   acknowledged its role in targeted killings as a result of numerous,

14   express statements from President Obama, CIA Director Panetta,

15   Director of National Intelligence Clapper, and various senior-ranking

16   members of Congress.[44]  We also referenced a publicly-released DOJ

---

[40] *See* Dissent at 3, 7–8.

[41] *Wilson*, 586 F.3d at 195 (holding that "anything short of an [official disclosure] necessarily preserves some increment of doubt regarding the reliability of the publicly available information").

[42] 756 F.3d at 116.

[43] *Id*. at 103.

[44] We noted three interviews, two instances of congressional testimony, and one speech in which these officials disclosed the CIA's involvement in targeted killings as the basis to conclude that such killings "ha[d] been

1    White Paper that "virtually parallel[ed]" the sought-after

2    information.  Moreover, Attorney General Holder had publicly

3    acknowledged a "close relationship" between the DOJ White Paper

4    and the information sought.[45]

5         We then applied the *Wilson* test to hold that the information

6    contained in the OLC-DOD Memorandum had been officially

7    disclosed because it was "as specific as the information previously

8    released in the DOJ White Paper, it match[ed] the information

9    previously disclosed, and was made public through an official and

10   documented disclosure."[46]  We still held, however, that other portions

11   of the Memorandum remained exempted due to a lack of specificity

12   and matching with the official disclosures.[47]

13        The Times's continued reliance on *ACLU v. CIA*,[48] which held

14   that the CIA's *Glomar* response pertaining to drones used for targeted

15   killings was unjustified, is also misplaced.  The Times argues that

16   *ACLU* supports its contention that there is no "basis for the CIA's

---

publicly acknowledged at the highest levels of the Government."  *Id*. at 118-19.

[45] *Id*. at 116-17.

[46] *Id*. at 120 (citation omitted).

[47] *Id*. at 117. ("The loss of protection for the legal analysis in the OLC-DOD Memorandum does not mean, however, that the entire document must be disclosed.").

[48] 710 F.3d at 422.

*Glomar* response" because the CIA would be revealing nothing more than its "interest" in the allegedly disclosed program.  This argument is unavailing for two reasons.

First, the pertinent official statements in *ACLU* were far more precise, thorough, and numerous than those found here.  The *ACLU* court found that the "extent of the official statements" regarding drone strikes was highly significant.[49]  President Obama "publicly acknowledged that the United States uses drone strikes against al Qaeda."[50]  In a speech, the President's counterterrorism advisor, John Brennan, discussed the United States' procedures for conducting drone strikes.[51]  CIA Director Panetta answered questions about drone strikes during separate public remarks.[52]  While no statement expressly indicated "that the CIA has documents relating to drone strikes,"[53] the D.C. Circuit had no difficulty concluding that the statements were detailed enough to "le[ave] no doubt that some U.S. agency" operates drones.[54]  Thus, it was neither "logical" nor "plausible" to maintain that the CIA had no documents related to

---

[49] *Id*. at 429.

[50] *Id*.

[51] *Id*.

[52] *Id*. at 431.

[53] *Id*. at 430.

[54] *Id*. at 429.

1   drones.[55]  The difference between the circumstances in *ACLU* and this

2   case is stark: here, based upon the doubts left by the statements, we

3   are unable to find an official acknowledgement.

4          Second, as in the recent D.C. district court case, *James Madison*

5   *Project*, the CIA "asserts a broader justification for issuing a *Glomar*

6   response than merely concealing an 'interest' in the [requested

7   document]."[56]  As Agent Shiner attested, acknowledging the existence

8   of responsive documents would: (1) "confirm the existence and the

9   focus of a sensitive Agency activity that is by definition kept hidden

10  to protect U.S. Government foreign policy objectives"; (2) "reveal

11  whether or not the United States Government exercised extraordinary

12  legal authorities to covertly influence the political, economic, and/or

13  military conditions in Syria," which could, "in turn, either

14  compromise a specific foreign policy goal . . . or serve as confirmation

15  for U.S. adversaries that there was no such objective"; and "require

16  the disclosure of an intelligence source or method."[57]  As we have

---

[55] *Id*. at 431.

[56] 302 F. Supp. 3d 12, 30 (D.D.C. 2018).

[57] Even assuming, as the Times argues, that the CIA would have an intelligence interest in arming and training rebel groups in Syria, just as it does with drone strikes, the statements here do not rise to the level of specificity found in *ACLU* to have waived the CIA's right to claim an exemption.  *ACLU*, 710 F.3d at 239-40.  The *ACLU* court relied on "the extent of the official statements on the subject," before holding that forcing the CIA to reveal whether it had an intelligence interest in drone strikes "would

1    noted, these justifications are sufficiently specific to support our

2    finding that the claimed Exemptions are "logical and plausible."

3           *Wolf v. CIA*, in the D.C. Circuit, is also distinguishable.[58]  There,

4    the CIA issued a *Glomar* response to a FOIA request for records

5    relating to Jorge Eliecer Gaitain, a Colombia politician, who had been

6    assassinated.[59]   The Court held the information was officially

7    acknowledged when the CIA Director testified before Congress and

8    "explicitly read some excerpts of [CIA] dispatches related to" Gaitan's

9    assassination into the record.[60]   After finding that the official

10   acknowledgement waiver applied, the D.C. Circuit made clear that it

11   "relates only to the existence or nonexistence of the records about

12   Gaitan disclosed by [the CIA Director]'s testimony."[61]  Therefore, the

13   plaintiff was entitled to the disclosure of only "the existence of the

14   CIA records about Gaitan that have been previously disclosed (but

15   not *any* others)."[62]

---

reveal something *not already officially acknowledged*." *Id*. at 242 (emphasis added).

[58] *Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007).

[59] *Id*. at 373.

[60] *Id*. at 379.

[61] *Id*.

[62] *Id*. (emphasis added).  We also recognize that a D.C. district court recently held, upon examining the same presidential tweet before us, that the CIA's *Glomar* response was improper because the tweet was sufficient to officially acknowledge such a program.  *Leopold v. CIA*, 419 F. Supp. 3d

1    Finally, the Times contends that U.S. Special Operations

2  Commander General Thomas's statements independently undermine

3  the plausibility of the CIA's justifications for its *Glomar* response.  At

4  oral argument, however, the Times conceded that General Thomas's

5  statements acted only as an "extra add-on" to those made by

6  President Trump.  In any event, it is undisputed that General Thomas,

7  a high-ranking officer in the Department of Defense, was not

8  authorized to speak for the CIA, and courts will "not infer official

9  disclosure of information classified by the CIA from . . . statements

10  made by a person not authorized to speak for the [CIA]."[63]

---

56 (D.D.C. 2019).  However, we are not persuaded by the district court's
reasoning.  As an initial matter, apart from the fact that the ruling is not
precedent, the district court itself observed that courts can only "infer such
a disclosure when the statement does not explicitly disclose the
information, but leaves *no doubt* as to its existence."  *Id.* at 66-67 (citing
*Leopold I*, 380 F. Supp. 3d at 24) (emphasis added).  As discussed, we think
lingering doubts remain as to the existence of any program and
corresponding records.

[63] *Wilson*, 586 F.3d at 186; *see also Frugone v. CIA*, 169 F.3d 772, 774 (D.C.
Cir. 1999) (holding that disclosures are not "official" when "made by
someone other than the agency from which the information is being
sought") (collecting cases).  Additionally, General Thomas's comments
appear to have been made in his personal capacity (*e.g.*, "based on what I
know about that program"), albeit with knowledge gleaned from his
position as U.S. Special Operations Commander.  Thus, they differ from
those in *Wilson* (*e.g.*, CIA disclosures on agency letterhead).

As it did before the district court, the Times relies on *Florez v. CIA*.[64]  The Times, however, reads *Florez* too broadly.  In that case, Florez filed a FOIA request seeking "the disclosure and release of any and all records between 1958 and 1990 related to and or mentioning [his] father, Armando J. Florez," who had served in several high-level diplomatic roles on behalf of Cuba.[65] The CIA answered with a *Glomar* response, which was upheld by district court.[66] During the pendency of Florez's appeal, the FBI "released several declassified documents pertaining" to Florez's father.[67]  The narrow issue facing us was whether the FBI disclosures were "relevant" and, if so, whether remand was required.[68]  We remanded the case to allow the district court to consider the new FBI disclosures in the first instance, without determining their effect on the *Glomar* response.[69]  Moreover, we confirmed that the official acknowledgement doctrine is "limited only to official and public disclosures made by the same agency providing the *Glomar* response, and therefore does not 'require[e] [the agency]

---

[64] 829 F.3d 178 (2d Cir. 2016).

[65] *Id*. at 180.

[66] *Id*. at 181.

[67] *Id*.

[68] *Id*. at 183.

[69] *Id*. at 190.

to break its silence' as a result of 'statements made by another agency.'"[70]

To be sure, there are times when other agency disclosures can be "relevant evidence" regarding the "sufficiency of the justifications set forth by the CIA in support of its *Glomar* response."[71]  But that is not the case here.  As the district court noted, General Thomas's statements are more ambiguous than the ones in *Florez*.[72]  General Thomas stated that he did not "know enough about the [program] to criticize it," that he could not describe the program because it was too complex, and that he offered his opinion based only upon what he gathered the program to be.  He also stated (without identifying the agency) that the organization was one that he was not "necessarily . . . affiliated with[.]"

In sum, after according appropriate deference to "the uniquely executive purview of national security,"[73] we conclude that the

---

[70] *Florez*, 829 F.3d at 186 (quoting *Furgone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999)).

[71] *Id*. at 184, 187.

[72] In *Florez,* the FBI disclosed that: "(1) the FBI investigated Dr. Florez's background and tracked his career development, official activities, and international relocations; (2) the FBI cultivated informants in order to obtain information concerning Dr. Florez, including material which pertained to both his professional and personal conduct; and (3) several other government departments and agencies provided to or received from the FBI information concerning Dr. Florez."  *Id*. at 178.

[73] *Wilner*, 592 F.3d at 76.

President Trump's statements, even when coupled with General Thomas's statements, left lingering doubts and thus were insufficient to amount to an official acknowledgement of the alleged covert program in Syria, much less the existence of records related to the program. It is still "logical or plausible" that disclosing the existence or nonexistence of an intelligence interest in such a program would reveal something not already officially acknowledged and thereby harm national security interests.

### III.   *The President's Statements Did Not Declassify the Existence of the Covert Program*

The Times next contends that the President's tweet and statements to the Wall Street Journal interviewer declassified the fact that the program existed, thus precluding the CIA from invoking FOIA Exemptions 1 and 3. The Times argues that this "conclusion flows inexorably from the President's supreme authority  in matters of classification." This novel argument is without merit.

It is true that the President has broad authority to classify and declassify, derived from the President's dual role "as head of the Executive Branch and as Commander in Chief" of the armed forces.[74] The "authority to classify and control access to information bearing on national security . . . flows primarily from this constitutional

---

[74] *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988).

1    investment of power in the President and exists quite apart from any

2    explicit congressional grant."[75]

3         To make its declassification claim, the Times essentially recasts

4    its "official acknowledgement" claim as one of "inferred

5    declassification."  To prevail in any claim of declassification, inferred

6    or otherwise, the Times's must show: first, that President Trump's

7    statements are sufficiently specific; and second, that such statements

8    subsequently triggered actual declassification.  The first is easily

9    disposed of because we have already found that the statements are

10   insufficiently specific to quell any "lingering doubts" about what they

11   reference.  The second requires further discussion.

12        Declassification cannot occur unless designated officials follow

13   specified procedures.[76]  Moreover, courts cannot "simply assume,

14   over the well-documented and specific affidavits of the CIA to the

15   contrary," that disclosure is required simply because the information

16   has already been made public.[77]  The Shiner affidavits, in addition to

---

[75] *Id*. (citing *Cafeteria Workers v. McElroy*, 367 U.S. 886, 890 (1961)).

[76] As explained above, Executive order 13,526 established the detailed process through which secret information can be appropriately declassified.

[77] *Phillippi*, 655 F.2d at 1325, 1330.  The Times is also concerned that "unless the President declassifies information by formal means or with magic words – or the circumstances are otherwise "exceptional" – a court can *never* infer declassification[.]" **[BB 33]** Such concerns are mitigated, however, by the "official acknowledgement" doctrine.  If the President publicly discloses the existence of a covert program within the *Wilson*

1    justifying the two FOIA exemptions, expressly stated that no

2    declassification procedures had been followed with respect to any

3    documents pertaining to the alleged covert program.[78]  Moreover, the

4    Times cites no authority that stands for the proposition that the

5    President can inadvertently declassify information and we are aware

6    of none.  Because declassification, even by the President, must follow

7    established procedures, that argument fails.

8           Finally, as the district court recognized, the suggestion that

9    courts can declassify information raises separation of powers

10   concerns.[79]  In light of the executive branch's "compelling interest" in

11   preventing declassification of highly sensitive information,[80] we

12   decline to hold that the judiciary may conclude that certain executive

13   branch statements may trigger inadvertent declassification because

14   such determinations encroach upon the President's undisputedly

15   broad authority in the realm of national security.

---

framework, **[BB 32-32]** then there would be no need for courts to "infer declassification."

[78] While the Times argues that the Court is "not bound by conclusory statements" in the CIA Affidavits, it does concede that such affidavits are entitled to "[d]eferential review[.]"

[79] See N.Y. Times Co., 314 F. Supp. 3d at 527.

[80] Snepp v. United States, 444 U.S. 507, 509, n. 3 (1980).

No. 18-2112-cv

1    In sum, mindful of the requisite deference courts traditionally

2    owe to the executive in the area of classification,[81] we decline to find

3    that President Trump's statements inadvertently declassified the

4    existence of the alleged covert program.

5                              **CONCLUSION**

6    For the reasons stated above, we AFFIRM the judgment of the

7    district court.

---

[81] *See United States v. Nixon*, 418 U.S. 683 (1974).

1 K<span style="font-variant:small-caps">ATZMANN</span>, *Chief Judge*, dissenting:

2 Unlike the majority, I believe that President Trump's public statements

3 cannot be logically interpreted as anything other than an acknowledgement of

4 the existence of "payments to Syrian rebels." The justifications the CIA provides

5 for issuing a *Glomar* response are neither "logical [n]or plausible" given the

6 President's public acknowledgement of the program the CIA purportedly seeks

7 to keep secret. *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009).[1] And

8 while the majority speculates that a *Glomar* response may additionally be

9 appropriate to disguise any "intelligence interest" the CIA has in the program,

10 the CIA never advances this as a justification for its response and we are thus

11 foreclosed from justifying the CIA's nondisclosure on this basis. *See id.* at 68 (the

12 "agency resisting disclosure of the requested records" bears the burden of

13 justifying application of a FOIA exemption). A *Glomar* response is "justified only

14 in unusual circumstances, and only by a particularly persuasive affidavit." *Florez*

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, footnotes, and citations are omitted.

1  *v. CIA*, 829 F.3d 178, 182 (2d Cir. 2016). Because I do not believe this is such a

2  circumstance, I respectfully dissent.

3        It is worth emphasizing the limited nature of the question before us, and

4  the extraordinarily limited practical consequences of requiring the CIA to issue a

5  non-*Glomar* response. The question before us is *not* whether the CIA must

6  disclose whether it has run, or even been involved in, any program of covert

7  payments to Syrian rebels. And it is *not* whether the CIA must disclose any

8  records it possesses concerning such a program, if it indeed possesses any

9  records. The question before us is solely whether the CIA must disclose the fact

10  that records responsive to the Times' request either do or do not exist. Were we

11  to find a *Glomar* response unjustified, the CIA could still avoid disclosing the

12  contents of any responsive records by making a proper showing before the

13  district court. *See, e.g., ACLU v. CIA*, 710 F.3d 422, 432 (D.C. Cir. 2013) ("The

14  collapse of the CIA's *Glomar* response does not mark the end of [a] case.").

15  **I.    President Trump's Official Acknowledgment**

16        The majority finds that President's Trump's tweet—"The Amazon

17  Washington Post fabricated the facts on my ending massive, dangerous, and

2

1    wasteful payments to Syrian rebels fighting Assad," App. 39—is ambiguous

2    because it could "just as easily" be read in two ways. According to the majority,

3    the President could mean either that: (1) he had ended a program of payments to

4    Syrian rebels that he himself thought was "massive, dangerous, and wasteful;"

5    or (2) the Post fabricated the existence of the payments program and described

6    that fictitious program as involving "massive, dangerous, and wasteful

7    payments to Syrian rebels fighting Assad." *See* Maj. Op. at 17–18 (finding that the

8    tweet "could just as easily be the President relaying what he believed to be the

9    Post's 'fabricated' characterizations.").

10        I find only the first reading plausible. Like the D.C. district court to

11    address the same tweet in another FOIA case, I can locate "no logical reading . . .

12    in which the tweet does not acknowledge that the U.S. government had *some*

13    knowledge of *some* payments to Syrian rebels." *Leopold v. CIA*, 419 F. Supp. 3d 56,

14    67 (D.D.C. 2019) (emphasis in original).

15        Even setting aside what we already understand as ordinary readers, we

16    know that the President was not relaying the Post's characterizations of the

17    fabricated program because the Post never characterized the program as

1     "massive, dangerous, and wasteful." In the Post's reporting, it is the President's

2     decision to end the payments that is dangerous and wasteful, not the payments

3     themselves. The Post article focuses on the perspectives of officials who believed

4     that the payments program was valuable, concluding that "[e]ven those who

5     were skeptical about the program's long-term value[] viewed it as a key

6     bargaining chip"—a value that, in the Post's reporting, was lost by the

7     Administration's decision to end the program.[2] App. 37. While some of the

8     officials who were skeptical of the program may have viewed it as "wasteful,"

9     the article never uses this word. And nowhere does the article describe the

10     payments to Syrian rebels as "massive" or "dangerous." Only the President

11     describes the payments as "massive, wasteful, and dangerous"—qualities that

---

[2] For instance, the Post reported that some analysts "said the decision to end the program was likely to empower more radical groups inside Syria and damage the credibility of the United States" and might cause the United States to "lose its ability to block other countries, such as Turkey and Persian Gulf allies, from funneling more sophisticated weapons . . . to anti-Assad rebels, including more radical groups." App. 36–37. One analyst equated the decision with "falling into a Russian trap" by "making the moderate resistance more and more vulnerable." *Id*. at 36. Another concluded that "Putin won in Syria." *Id*. One former official described "ending the aid to the rebels altogether" as "a huge strategic mistake." *Id*. at 37.

1    payments can only have if they exist.

2          The President's comments to the Wall Street Journal the day after the tweet

3    offer yet further confirmation that he was intentionally acknowledging the

4    payments. Discussing "the story about Syria that was in The [Washington Post]

5    the other day," President Trump said that "they didn't write the truthful story"

6    because "[i]t turns out it's—a lot of al-Qaeda we're giving these weapons to."

7    App. 44. Reading the exchange leaves an ordinary reader with no doubt that the

8    President is clearly, consciously acknowledging and discussing the payments

9    program in order to dispute the Post's characterization of the program and to

10   advocate for more serious efforts to root out leaks in his administration.

11         Despite all this evidence of the President's meaning, the majority

12   nevertheless concludes that the President did not acknowledge the payments

13   program because his statements are not clear enough to "remove *all* doubt as to

14   their meaning." Maj. Op. at 17. But we have never suggested that the ability to

15   read any doubt whatsoever, no matter how implausible or how belied by

16   context, into a statement calls an official acknowledgment into question. The

17   majority's description of the value of even an "increment of doubt" is borrowed

1    from a discussion of a very different kind of doubt, the "lingering doubts" left as

2    to information's accuracy when it is disclosed to the public by unofficial means

3    without official acknowledgment. *Wilson v. CIA*, 586 F.3d 171, 195 (2d Cir. 2009).

4    In *Wilson*, we concluded that "anything short" of an official disclosure

5    "necessarily preserves some increment of doubt regarding the reliability of the

6    publicly available information," or, in other words, plausible deniability. *Id.*; *see*

7    *also id.* at 196–99 (Katzmann, *J.*, concurring in the judgment). Here, we are not

8    addressing an unofficial statement that would leave this kind of doubt as to

9    accuracy; we are addressing a disclosure that came directly from the President.

10   Had the President himself publicly stated the dates of Ms. Wilson's employment

11   in the CIA—the information there at issue—*Wilson* would have been a different

12   case entirely.

13          To the degree that the majority is suggesting that some critical mass of

14   official statements is required to find official acknowledgment, I disagree.[3] I see

---

[3] *See* Maj. Op. at 19–20 (discussing the number of statements in *New York Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 116–20 (2d Cir.), *opinion amended on denial of reh'g*, 758 F.3d 436 (2d Cir.), *supplemented*, 762 F.3d 233 (2d Cir. 2014)); Maj. Op. at 21 (discussing the number of statements in *ACLU*, 710 F.3d at 422, 429–31).

1    no support in case law or in logic for the position that more than one official

2    acknowledgment is required, or that a public, official, documented statement

3    directly from the President is insufficient to constitute an official

4    acknowledgment. Rather, even a single statement by the President—who is, after

5    all, the official charged with the functioning of the entire Executive Branch—may

6    suffice, without the need for external corroboration or support. To hold

7    otherwise would fail to accord the proper weight and respect owed to

8    presidential statements.

9         The majority also contends that the President's statements do not meet the

10    "specificity" and "matching" requirements for official disclosure. Maj. Op. at 14–

11    17. But "[i]n the *Glomar* context, the 'specific information' at issue is not the

12    contents of a particular record, but rather the 'existence *vel non*' of any records

13    responsive to the FOIA request." *ACLU*, 710 F.3d at 427. As the majority notes,

14    we have on occasion considered official statements that are more "precise" and

15    "thorough" than the President's statements here. Maj. Op. at 21. However, the

16    level of precision and detail in an official statement is relevant to *what* has been

17    officially acknowledged, not whether there has been any official

1   acknowledgment at all. Here, the question before us at this time is only whether

2   the President has officially acknowledged the existence of a payments program,

3   not whether he provided a thorough description of the program. The latter

4   would be relevant to the determination of what records concerning the program

5   must be disclosed were the CIA to issue a non-*Glomar* response, not whether the

6   CIA can issue a *Glomar* response declining to disclose the program's existence.

7   President Trump's acknowledgment of the payments' existence is sufficient for

8   *Glomar* purposes.

9        Presumably, in choosing to repeatedly acknowledge the existence of the

10  payments program, the President engaged in a calculus, weighing whether the

11  need to dispute the Post's characterization of the program as valuable and of his

12  administration's termination of it as "falling into a Russian trap," App. 36,

13  outweighed the national security risks posed by acknowledging that such a

14  program had indeed existed. The President evidently determined that the

15  benefits of official disclosure outweighed the risks. It is not our business as

16  judges to second-guess the President's decision, or to create doubt to avoid its

17  consequences. *See, e.g.*, *Wilner*, 592 F.3d at 76 (noting "our deferential posture in

1   FOIA cases regarding the uniquely executive purview of national security" given

2   "the relative competencies of the executive and the judiciary"). We must proceed

3   on the basis of whatever decision the President has made as to disclosure,

4   regardless of whether we would have made the same determination had we the

5   authority to do so.

6   **II.    The CIA's Justifications**

7        Given the President's acknowledgment of the payments program, the CIA

8   has failed to meet its burden of showing that its justification for invoking

9   Exemptions 1 or 3—that a substantive response would disclose the existence of

10  the program—"appears logical or plausible." *Wilner*, 592 F.3d at 73.

11       I agree with the majority that, under our precedent in *Wilner*, even where a

12  FOIA request concerns "a program whose existence has been publicly revealed,"

13  *id.* at 69, an agency may provide a *Glomar* response if the request concerns

14  "aspects of the program that have not been the subject of such disclosures," *id.* at

15  70. However, unlike in *Wilner*, a non-*Glomar* response would not reveal

16  undisclosed aspects of the payments program; it would only reveal the already-

1    disclosed fact that some payments program existed.[4]

2          The CIA argues that a *Glomar* response is justified because acknowledging

3    the existence of responsive documents would: (1) "confirm the existence and the

4    focus of a sensitive Agency activity that is by definition kept hidden to protect

5    U.S. Government foreign policy objectives," App. 21; (2) reveal "whether or not

6    the United States Government exercised extraordinary legal authorities to

7    covertly influence the political, economic, and/or military conductions in Syria,"

8    which "could, in turn, either compromise a specific foreign policy goal . . . or

9    serve as confirmation for U.S. adversaries that there was no such objective," App.

---

[4] In *Wilner*, the plaintiffs were requesting records showing whether they had been a target of surveillance under the National Security Agency's ("NSA") Terrorist Surveillance Program, *see* 592 F.3d at 64, which was then "no longer a secret program in light of the government's public acknowledgment of its existence and purpose following its controversial disclosure by the news media," *id.* at 69. We held that the NSA could still issue a *Glomar* response because, although the program was public, the fact of whether plaintiffs had been a target of surveillance was not and would be revealed by a non-*Glomar* response to the detriment of national security concerns. *Id.* at 7–74. But the *Wilner* plaintiffs' request is not analogous to the Times' request in the instant case. Unlike in *Wilner*, here the CIA did not simply refuse to confirm or deny the existence of *particular* records relating to the payments program, but refused to confirm or deny that *any* records related to such program exist—even though, as discussed above, the President himself has acknowledged the existence of the program.

10

1   60; and (3) reveal "whether or not the CIA is exercising covert action" and

2   thereby "require the disclosure of an intelligence source or method," App. 60. In

3   other words, the CIA argues that a *Glomar* response is necessary to keep the

4   program secret. Given that the President has already disclosed the program, this

5   justification is no longer plausible. To the extent that the CIA also argues that a

6   non-*Glomar* response would reveal additional details of the program's focus or

7   methods, this may serve as justification for withholding release of the contents of

8   certain *specific* responsive documents, but does not justify a blanket *Glomar*

9   response. A non-*Glomar* response would not result automatically in disclosure of

10  the contents of any responsive records and therefore would not disclose whether

11  the CIA was involved in the payments, only that it had records concerning them.

12          The majority conjectures that a *Glomar* response additionally may be

13  required to avoid revealing whether the CIA had an "intelligence interest" in the

14  payments. Maj. Op. at 27. The majority leaves unclear the degree to which it

15  actually believes that any "lingering doubts as to the CIA's interest in the alleged

16  program" can be maintained, *id*. at 17–18, at some points describing the need to

17  avoid disclosing any CIA "interest" and at other points stressing the fact that the

1    CIA "asserts a broader justification for issuing a *Glomar* response than merely

2    concealing an interest in the requested document," *id.* at 21; *see also id.* at 14 ("The

3    Shiner affidavits contain sufficiently detailed justifications . . . that are broader

4    than just a potential interest in the program . . . .").

5         But even if it could be plausibly maintained that there are any lingering

6    doubts about whether the CIA might be interested in the existence of a program

7    providing payments and training to Syrian rebels, the CIA has never justified its

8    *Glomar* response on the ground that it is necessary to conceal any "intelligence

9    interest,"[5] likely because the Central *Intelligence* Agency itself does not consider it

---

[5] To defend its reliance on the purported need to avoid disclosure of an "intelligence interest," the majority refers to two paragraphs in the Shiner affidavits that claim that the CIA's "interests" would be impaired by a non-*Glomar* response. Maj. Op. 18 n.37. But each paragraph only asserts that the CIA's interests would be harmed by the disclosure *of CIA involvement* in any covert payments program. *See* App. 22 ("A response other than *Glomar* as to the existence or nonexistence of a program *and any CIA involvement* would disclose a classified fact. . . . [I]t would reveal the presence or absence of Agency priorities, capabilities, interests, resources, and relationships with foreign entities.") (emphasis added); *id.* at 60 ("Further, the *CIA's connection to such a program*, if one existed, would tend to reveal the Agency's capabilities, intelligence and regional interests, accesses, funding, and relationships or lack thereof.") (emphasis added). The government's brief confirms—relying upon the very same paragraphs cited by the majority—that the CIA's objection is only to disclosure of its involvement with a covert payments program. *See* Appellee's Brief at 9 ("A

1    "logical" or "plausible" that "an agency charged with gathering intelligence

2    affecting the national security does not have an 'intelligence interest' in [such

3    payments], even if that agency does not operate the [payment program] itself."

4    *ACLU*, 710 F.3d at 430 (addressing the plausibility of the CIA having no

5    intelligence interest in drone strikes). As a recent D.C. district court opinion

6    addressing a *Glomar* response to a similar FOIA request observed, "it seems

7    wildly unlikely that, in the eight and a half years since the Syrian civil war began,

8    the Central Intelligence Agency has done no intelligence-gathering that

9    produced a single record even *pertaining to* payments Syrian rebels are receiving

10   from *somewhere*, or a single record even *mentioning* or *referring to any program* to

11   arm or train anti-Assad rebels." *Leopold*, 419 F. Supp. 3d at 67.

12         To the contrary, the CIA has been clear that it seeks only to conceal its

13   actual "involvement or non-involvement" in the payments. Appellee's Br. 23; *see*

---

confirmation or a denial *of the CIA's connection* with any such program would
therefore reveal the presence or absence of CIA priorities, capabilities,
intelligence and regional interests, resources, and relationships with foreign
entities.") (citing App. 22, 60) (emphasis added). Therefore, in my view, the
record does not support the majority's position that, even if the program's
existence has been confirmed, the CIA has asserted a need to hide any *interest* in
the program.

1    *also id.* at 24 (arguing that issuing a non-*Glomar* response "would be tantamount

2    to disclosing . . . whether the CIA was *in fact involved* in such a program"

3    (emphasis added)). Indeed, the CIA argues that a non-*Glomar* response would

4    "reveal more than the CIA's general intelligence interest in a program"—thus

5    implicitly conceding that such an interest would not, standing alone, be

6    sufficient—and urges that non-disclosure is justified because a non-*Glomar*

7    response would reveal "information about a CIA operational role or lack or one."

8    *Id.* at 25–26.

9         There is no question that it is the CIA's burden to present and prove its

10   justification for a *Glomar* response. *Wilner*, 592 F.3d at 68. Our role is merely to

11   ensure that the justifications the CIA puts forth are logical and plausible, not to

12   advance bases for the agency's action that the agency itself has not claimed.

13   Accordingly, avoiding disclosure of the CIA's intelligence interest in payments to

14   foreign rebels is not a basis for us to affirm.

15                     **CONCLUSION**

16         Reversing the district court would leave the CIA free to argue on remand

17   that every single responsive document or even that any information about those

18   documents other than their mere existence is exempt from disclosure. Instead of

14

1    reversing and remanding to district court to allow the CIA the opportunity to

2    make such a showing, the majority decision puts its "imprimatur to a fiction of

3    deniability that no reasonable person would regard as plausible"—that the

4    President never acknowledged the existence of payments to Syrian rebels. *ACLU*,

5    710 F.3d at 431. Accordingly, I respectfully dissent.

6

7